Clifford S. HEINZ, Plaintiff,

v.

Catherine Elaine HAVELOCK, et al., Defendants.

No. CV 90–5458 AWT.

United States District Court, C.D. California.

Feb. 19, 1991.

Bernard I. Segal, Jonathan Klar, Segal & Klar, Los Angeles, Cal., Jane D. Saltsman, Glassman & Browning Inc., Beverly Hills, Cal., for plaintiff.

Daniel Fogel, Lester G. Ostrov, Gerald J. Miller, Fogel, Feldman, Ostrov, Ringler & Klevens, Los Angeles, Cal., for defendants.

## MEMORANDUM OPINION

TASHIMA, District Judge.

Plaintiff Clifford S. Heinz ("plaintiff"), a citizen of California, filed this action in Orange County Superior Court on September 10, 1990, against his wife, Catherine Elaine Havelock ("Havelock–Heinz"), and her two children by a former marriage, Wendy Coleman ("Wendy") and Jeffrey P. Massnick ("Jeffrey"). Defendants removed the action to federal court on the grounds of diversity of citizenship jurisdiction and filed a motion to dismiss.

Shortly after removal, plaintiff filed a "notice of objections" to defendants' removal. In the notice, plaintiff stated that he intended to file a motion to remand for lack of diversity, but first needed to take discovery on that issue to support his motion. Specifically, plaintiff intended to show that Havelock–Heinz and Wendy were not citizens of North Carolina as alleged in the notice of removal, but were,

like him, citizens of California. However, at the time defendants filed their motion to dismiss, plaintiff had not yet filed his motion to remand.

Wherever possible, a federal court should rule on its jurisdiction before reaching the merits. Therefore, the court delayed consideration of defendants' motion to dismiss, and, with an appropriate period granted for discovery, ordered plaintiff to show cause why the action should be remanded to state court.

For the reasons discussed below, the court remands the action to state court.

## I. FACTS

Plaintiff and Havelock–Heinz were married in 1987. At the time of the marriage, Havelock–Heinz had two grown children by a previous marriage, Wendy and Jeffrey. For most of their marriage, plaintiff and Havelock–Heinz resided together at 4 Canyon Drive Fairway in Newport Beach, California (the "Canyon Drive residence"). However, Havelock–Heinz had also purchased an additional property in her own name, a condominium at 39 Auburn Aisle in Irvine, California (the "Irvine condominium"). According to Havelock–Heinz, she purchased this property as an investment and as a studio for her artwork, not as a residence. She further claims that she put the condominium up for sale in June 1990, but only recently reached an agreement to sell it.

In mid–1990, the marriage began to deteriorate. Havelock–Heinz claims that plaintiff became abusive toward her and Jeffrey. She asked her daughter Wendy, who had been living in New Mexico, to stay with her during this difficult time. Wendy claims that she intended to return to the East Coast—where she lived previously—once her mother's situation had stabilized.

In June and July of 1990, Jeffrey, a citizen of Virginia, began looking for an estate-type residence in North Carolina. He claims that he intended to use the residence as an investment property and as a residence where his family could stay. During this time, he and Wendy began discussing the possibility of Wendy living

on the property to raise horses and Wendy decided to do so.

On August 1, 1990, Jeffrey began submitting offers to purchase a property known as "Buck Quarter." The seller accepted an offer on August 10. However, Jeffrey and the seller did not finalize the purchase price and execute the contract of sale until September 18, 1990.

Meanwhile, the conditions at the Canyon Drive residence continued to deteriorate. On August 2, 1990, plaintiff filed an action in Orange County Superior Court against Havelock–Heinz, Wendy and Jeffrey (the "first action"). The complaint alleged malpractice, breach of fiduciary duty, fraud, conspiracy, constructive trust, and RICO violations. Havelock–Heinz was served with the summons and complaint in the first action the next day.

Havelock–Heinz claims that plaintiff essentially drove her out of the house by monitoring her comings and goings and ordering the staff not to deal with her. Ultimately, she and Wendy moved into the Irvine condominium. When she returned to the Canyon Drive residence to pick up her belongings, she discovered that plaintiff had changed the locks and alarm codes.

Havelock–Heinz claims that it was at this point that she decided to move to North Carolina with Wendy. Defendants contend that they took steps in preparation for the move: (1) Jeffrey sent his mother and Wendy various photographs and diagrams of Buck Quarter, where both of the latter intended to live; (2) Havelock–Heinz and Wendy began to pack their belongings; (3) Havelock–Heinz arranged to complete an art project—a mural with a bronze sculpture—for the Carnation Company; and (4) Havelock–Heinz and Wendy told their friends and business associates of their plans to move to North Carolina.

On September 4, 1990, defendants removed the first action to federal court, asserting federal question jurisdiction based on the RICO claim. On September 10, 1990, plaintiff voluntarily dismissed the first action, and filed the instant action. The complaint in this action is identical to

that in the first action, except that it omits the RICO claim, *i.e.*, the basis of federal question jurisdiction.

On the same day that plaintiff filed the new complaint, Havelock–Heinz and Wendy boarded a 7:00 a.m. flight to North Carolina. As of that date, Havelock–Heinz had not yet finished her work on the Carnation art project. Defendants claim that they chose the September 10 date because there was a "lag time" during which Havelock–Heinz could do no work on a bronze sculpture which was to be installed in the middle of the mural. Havelock–Heinz was told that she could continue her work on the bronze sculpture on September 15. Therefore, she and Wendy made return reservations for September 13.

Havelock–Heinz and Wendy arrived in North Carolina at approximately 5:00 p.m. Jeffrey was already in North Carolina and was to meet them at the airport. Plaintiff was apparently aware of the trip, because he arranged to have Jeffrey served at the airport. Jeffrey was served with summons and complaint at the airport. However, defendants claim that Jeffrey did not inform his mother and sister about the new complaint until the next day.

Havelock–Heinz and Wendy assert that they intended to move into Buck Quarter shortly after their arrival. However, after seeing the residence, they decided that it needed more extensive renovations. Further, Jeffrey informed them that the house had a radon gas problem which he wanted to resolve. Havelock–Heinz and Wendy then decided to stay in hotels and to search for a temporary house to lease. Jeffrey arranged for them to meet with a real estate broker who would show them various residences.

Havelock–Heinz and Wendy claim that one day after their arrival, the broker showed them a property known as "Old Forge Circle." They further claim that they decided to lease the property immediately after seeing it. Further, they contend, they were so certain that they would

be able to lease the property that they each filled out postal change of address cards reflecting their new address. Wendy dated her change of address card September 11, 1990 and Havelock–Heinz dated hers September 9, 1990. However, defendants were not so certain of their new address as to mail immediately the change of address cards; the cards are postmarked September 20, 1990. Although Havelock–Heinz and Wendy claim that they were sure they would be able to rent the property, negotiations delayed the signing of the lease until September 18 or 19 and they did not move into Old Forge Circle until after signing the lease.

Meanwhile, Havelock–Heinz had learned that the bronze sculpture would not be ready on time. She and Wendy changed their return reservations from September 13 to September 26. After arriving in California on the 26th, Havelock–Heinz completed the Carnation project and Wendy met the movers at the Irvine condominium. The two returned to North Carolina on October 2. Their belongings did not arrive until October 8 or 9.

Havelock–Heinz and Wendy claim that they have taken a number of steps since September 10 to establish their domicile in North Carolina. They have: (1) made extensive renovations to Buck Quarter; (2) moved their belongings from California to North Carolina; (3) obtained North Carolina drivers' licenses; and (4) registered to vote and voted in the November 1990 election. In addition, Wendy has arranged to sell her car in California and Havelock–Heinz has had hers shipped to, and re-registered in, North Carolina. Havelock–Heinz and Wendy moved into Buck Quarter on December 18, 1990, when the renovations were complete.

## II. ISSUE

The sole issue presented here is whether Havelock–Heinz was a citizen of North Carolina at the time this action was commenced.[1]

---

**1.** Plaintiff challenges the citizenship of both Havelock–Heinz and Wendy. As to the latter, plaintiff assumes that before moving to North Carolina, Wendy was a citizen of California. However, there is little evidence of where her domicile was on September 10, 1990, and imme-

### III. THE LEGAL STANDARD

■ The party asserting diversity jurisdiction bears the burden of proof. *Lew v. Moss*, 797 F.2d 747, 749 (9th Cir.1986). Since defendants removed this case, *i.e.*, they are the parties invoking this court's jurisdiction, they have the burden of establishing that their domicile was in North Carolina when this action was commenced. The existence of domicile "is determined as of the time the lawsuit is filed." *Id.* at 750.

■ "[A] person is 'domiciled' in a location where he or she has established a 'fixed habitation or abode in a particular place, and [intends] to remain there permanently or indefinitely.'" *Id.* at 749–50 (quoting *Owens v. Huntling*, 115 F.2d 160, 162 (9th Cir.1940)). A person's old domicile is not lost until a new domicile is acquired. A change in domicile requires: "(a) physical presence at the new location with (b) an intention to remain there indefinitely." *Id.* at 750. "[C]ourts have created a presumption in favor of an established domicile as against a newly acquired one." *Id.* at 751.

■ The determination of domicile involves a number of factors including:

> current residence, voting registration and voting practices, location of personal and real property, location of spouse and family, membership in unions and other organizations, place of employment or business, driver's license and automobile registration, and payment of taxes.

*Id.* at 750. Domicile must be evaluated in terms of objective fact. Statements of intent should be accorded little weight if in conflict with objective fact. *Id.*[2]

### IV. DISCUSSION

#### A. Physical Presence in California on September 10, 1990

■ Plaintiff contends that Havelock–Heinz cannot meet the "physical presence" requirement since she did not arrive in North Carolina until 5:00 p.m., *after* the complaint was filed. Defendants argue that it is the day that the act occurs, not the precise hour or minute of that day, that is relevant for determining a change of domicile. As *Lew v. Moss* held, domicile is determined "as of the time the lawsuit is filed." 797 F.2d at 750. At the time this lawsuit was filed, Havelock–Heinz was still in transit to North Carolina, *i.e.*, she was not present in that state. Therefore, she has not met the physical presence requirement for establishing a new domicile, as of the time this action was commenced. Given the presumption favoring the established domicile, on this factor alone, the court holds that Havelock–Heinz was still a citizen of California at the time this action was commenced.

However, even if the court were to accept defendants' position that it is the day—not the precise hour or minute—that counts, the court would still find that Havelock–Heinz was domiciled in California on that date. Defendants have not met their burden of showing that Havelock–Heinz had established the new domicile as of the *date* of the filing.

#### B. The Timing of the Alleged Move and the Lack of Moving Preparation

■ According to plaintiff, defendants were nothing more than visitors in North Carolina on September 10. Thus, although they were present in North Carolina on that date, they had not moved as of that date.

There are a number of factors that support plaintiff's position. Havelock–Heinz and Wendy's airline reservations show that, before their sudden change of plans, the two were scheduled to return to Cali-

---

diately prior thereto. According to her, "I never intended to remain indefinitely in California during the period that I stayed in California with my mother." Decl. of Coleman, ¶ 2.

Because, given the requirement of *complete* diversity, *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L.Ed. 435 (1806), the citizenship of Havelock–Heinz is dispositive of the issue of the existence of diversity of citizenship, it is unnecessary to decide what Wendy's citizenship was. Thus, although we examine the evidence regarding Wendy's move, we do so only as it may shed light on the issue of Havelock–Heinz's citizenship.

**2.** The motives which prompt a change of domicile are immaterial. *See* discussion at Part IV.C, *infra*.

fornia three days later on September 13. When they arrived in North Carolina, they did not have a home ready to move into and did not lease a place to live until September 18. Although defendants claim that they intended to live in Buck Quarter, Jeffrey did not even execute the purchase contract until September 18. Furthermore, it wasn't until defendants' return trip to California that they finally contacted movers.[3] The actual delivery of their belongings was not until October 8 or 9, almost a month after their purported move.

Defendants have only weak explanations for their sudden move and the total lack of preparations for a permanent move. They attribute their choice of the September 10 moving date solely to the "lag time" in the completion of the Carnation project. Defendants admit that they did not choose the date well in advance of the move. They do not explain why it was so urgent for them to make a permanent move to North Carolina, knowing full well that they would have to return to California three days later.

Havelock–Heinz insists that she fully intended to move into Buck Quarter on September 10. However, she admits that she knew the house was unfurnished. Havelock–Heinz offers no credible explanation as to why she did not arrange to move her belongings until after her return to California.

Jeffrey claims that he believed that his family would be able to move in by September 10. However, he does not explain why he did not inform them about the radon gas problem until they arrived. Nor does he explain why he believed that his family could move in when the sale of the house

did not even close until September 18, eight days after the purported move.

While the facts of this case are unique, they bear some resemblance to the facts of *Ness v. Dean Witter Reynolds, Inc.*, 677 F.Supp. 861 (D.S.C.1987). In *Ness*, the court considered whether the defendant was a resident of Arkansas as of June 27, the date of the filing of the complaint. The defendant claimed that he had formed the intent to establish Arkansas as his new domicile by June 27. However, the defendant's furnishings had not yet arrived in Arkansas by that date, although they were "on the way." Furthermore, although the defendant had arranged to lease a home in Arkansas and had closed the sale of his old home in South Carolina, he could not move into his new home until June 29. The court found that the defendant had not established that he had physically moved to Arkansas by June 27.[4]

The defendant in *Ness* clearly took more steps to establish a new domicile than did defendants here. Although *Ness* is not binding on this court, its reasoning is persuasive. The unusual timing of the move, the lack of moving preparations and the absence of any credible explanation for both, strongly suggest that Havelock–Heinz had not permanently moved to North Carolina as of September 10, 1990.

## C. Motive to Create Diversity Jurisdiction

■ Plaintiff emphasizes that Havelock–Heinz had a motive to change her domicile—the creation of diversity jurisdiction. He contends that it is inherently incredible that Jeffrey would have failed to inform his mother and sister until one day later that he had been served with summons and

---

**3.** Plaintiff observes that one of defendants' hotel bills lists the Irvine condominium address as a home address. Havelock–Heinz and Wendy deny giving the hotel this address. They claim that the clerk must have copied it off of Wendy's California driver's license.

Defendants never explain why Wendy would have the Irvine address as her home address on her driver's license when: (a) Wendy was allegedly staying only temporarily with her mother; and (b) both Wendy and Havelock–Heinz deny that the Irvine condominium was a residence

and claim that they only stayed there temporarily after being evicted from the Canyon Drive residence.

**4.** Defendants emphasize that one of the factor's in the *Ness* decision was that the defendant was actually served at a friend's house in South Carolina. However, the place of service was not the only factor in the court's decision. Further, although plaintiff served Jeffrey in North Carolina, Havelock–Heinz and Wendy were apparently served in Orange County, California.

complaint in this action. Further, plaintiff insists that defendants must have contacted their lawyers after learning of the new complaint. Since this complaint does not contain a RICO claim, the lawyers would have informed defendants that the only basis for federal court jurisdiction would have been diversity jurisdiction. Plaintiff suggests that it was this knowledge that prompted defendants to turn a short "visit" into a permanent "move." He urges the court to consider this motive in evaluating defendants' purported change of domicile.

The motive for a change of domicile is immaterial to the determination of the existence of diversity of citizenship, provided that the move is *bona fide. See Williamson v. Osenton*, 232 U.S. 619, 625, 34 S.Ct. 442, 443, 58 L.Ed. 758 (1914). However, the court may consider evidence of motive in evaluating the honesty of defendants' asserted intention to establish a new domicile. *Id.;* 1 Moore's Federal Practice ¶ 0.74[3.–4] (2d ed. 1990). Here, defendants contend that they flew to North Carolina on September 10 with the intention of establishing a permanent domicile. The fact that defendants had a motive to remain in North Carolina after learning of the new action makes their story of a sudden, permanent move less than credible.

### D. The Backdating of Documents

Plaintiff accuses Havelock–Heinz and Wendy of backdating their postal change of address forms to create a false impression of an intent permanently to remain in North Carolina. As noted above, both Havelock–Heinz and Wendy filled out forms indicating that the Old Forge Circle property was their new residence. Havelock–Heinz dated her forms September 9, 1990 and Wendy's were dated September 11, 1990. However, the forms were not postmarked until September 20, 1990.

Plaintiff argues that Havelock–Heinz and Wendy did not even see the Old Forge Circle residence until September 12; therefore, the dates on the cards are clearly incorrect. Defendants, however, contend that they first saw the property on September 11. Regardless of which date is cor-

rect, defendants could not have seen the residence on September 9, the date reflected on Havelock–Heinz's cards. Defendants had not yet arrived in North Carolina on that date. Moreover, as the postmarks indicate, the cards were not mailed until after they had actually rented the property.

To support his claim that the dates on the change of address cards were deliberately falsified, plaintiff has submitted a declaration from a handwriting expert. The declaration indicates that Havelock–Heinz had written the date "9/9/90" as a moving date on her cards. However, she had crossed out a digit immediately before the second "9." The handwriting expert believes the crossed-out digit to be a "1." *See* Rile Decl., Ex. B. Plaintiff, thus, concludes that Havelock–Heinz had originally written "9/19/90," the correct date, but crossed out the "1" in an attempt falsely to show that she had changed domicile by September 10.

Once again, Havelock–Heinz offers only a weak explanation for her behavior. Defendants claim that they filled out change of address cards early because they were certain they would be able to lease the property. However, they decided not to mail them until they had actually leased the property. With respect to the crossed-out digit, Havelock–Heinz claims that she simply made a mistake. However, she does not explain why she listed September 9 as the change of address date.

While the dates on the address cards alone may not be enough to show that defendants deliberately set out to create a false impression of an earlier change of domicile, they do bear on the credibility of defendants' story. It is difficult to believe that defendants would have filled out the address cards without having finalized the lease or, in Havelock–Heinz's case, without even having seen the property.

### E. Remaining Ties to California

Plaintiff contends that Havelock–Heinz's continuing ties to California demonstrate that she never had the intention of remaining in North Carolina. Plaintiff lists a number of these ties: (1) before Havelock–

**1082**

Heinz moved to California she had preliminary X-rays and wax impressions made in preparation for extensive dental work by an Orange County dentist; (2) Havelock-Heinz continues to retain a bank account in Los Angeles; (3) she has never turned off the water, telephones, and electricity at the Irvine condominium; (4) she has ailing parents in Southern California who are in need of care; (5) she was seeing a psychiatrist regularly when she was in California, but has no psychiatrist in North Carolina; (6) she has a professional counseling license in California, but is not licensed to practice in North Carolina and has not sought a license; and (7) she has filed for a divorce in Orange County and will therefore need to return to California.

Havelock-Heinz has offered explanations for each of these remaining ties. She claims that: (1) the dental work she contemplated was primarily cosmetic in nature and could be easily continued in North Carolina; (2) the reason she continues to have a bank account in Los Angeles is that she does not trust the North Carolina banks; (3) she left the utilities on in the Irvine condominium because her real estate broker encouraged her to do so, so that the broker could show the home to prospective buyers; (4) although her parents live in California, it is her sister who is primarily responsible for their care; (5) she stopped seeing her psychiatrist well before she left for North Carolina; (6) she has not practiced counseling since 1983, and therefore has no need for a license in North Carolina; and (7) she filed for divorce in Orange County because that is where her husband lives.

Plaintiff may be overemphasizing the importance of most of these remaining ties to California. It is not unusual for a person to have remaining ties to an old domicile. Nonetheless, in light of the other circumstances, these ties do cast some doubt on Havelock-Heinz's purported change of domicile. For example, it is difficult to believe that she would begin extensive dental work with a particular dentist if she did not intend to have the work completed by that dentist. Furthermore, while she asserts that she has retained a Los Angeles bank account because she does not "trust" North Carolina banks, she has, in fact, opened a number of bank accounts in North Carolina.

## V. CONCLUSION

The clear weight of the evidence before the court establishes that Havelock-Heinz was not domiciled in North Carolina as of September 10, 1990, the date this action was commenced. Rather, the facts strongly suggest and the court finds that defendants initially intended the trip to be a short one. While Havelock-Heinz has taken a number of important steps *since* September 10 to change her domicile from California to North Carolina, she had taken very few steps, if any, by that date. The court finds that Havelock-Heinz continued to be a citizen of California on September 10, 1990.

The court, thus, concludes that defendants have failed to meet their burden of establishing that the court has diversity of citizenship jurisdiction over this action. Both plaintiff and defendant Havelock-Heinz were citizens of California on September 10, 1990, when this action was commenced. Accordingly, this action shall be remanded to state court.