IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 120,935

O. GENE BICKNELL and
O. GENE BICKNELL as Administrator
of the Estate of RITA J. BICKNELL,
*Appellees*,

v.

KANSAS DEPARTMENT OF REVENUE,
*Appellant.*

SYLLABUS BY THE COURT

1.

Whether venue is proper under the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq., is a question of law subject to unlimited review.

2.

This court reviews a district court's decision on a K.S.A. 2020 Supp. 60-212(b)(3) motion to dismiss for improper venue under a de novo standard, and we accept as true the allegations and factual assertions in the pleading when those are uncontroverted.

3.

The KJRA's venue provision, K.S.A. 77-609(b), provides that venue is proper in the county in which an order or agency action is entered or is effective or the rule and regulation is promulgated. Venue may lie in more than one county under this statute. When venue for a KJRA proceeding is proper in more than one county, the district court should give due consideration to the plaintiff's right to choose the place of the action.

1

4.

When an agency order determines that an individual is a Kansas resident for tax purposes based on the individual's contacts with a particular county, the order is effective in that county under K.S.A. 77-609(b).

5.

Whether the district court erroneously shifted the burden of proof is a question of law subject to unlimited review.

6.

The party asserting an agency action is invalid bears the burden of proving the invalidity under K.S.A. 77-621(a)(1). And the burden of proof remains with that party throughout the proceedings.

7.

A party claiming a change of domicile has the burden of proving the existence of the new domicile. Generally, a person must show the concurrence of two facts to establish a change of domicile—physical presence in a new location and an intent to remain in that location, either permanently or indefinitely.

8.

In interpreting the meaning of a statute or regulation, we first look to the plain language of the provision and the ordinary meaning of that language.

9.

K.A.R. 92-12-4a(b)(5) creates a presumption that spouses who are still married and not legally separated have the same domicile, but that presumption may be rebutted

2

by any affirmative evidence to the contrary. The plain language of this provision imposes no requirement that the spouses prove they live apart to overcome the spousal presumption.

10.

When a district court has made findings of fact and conclusions of law, an appellate court determines whether the factual findings are supported by substantial competent evidence and whether those findings support the district court's conclusions of law. Substantial competent evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion.

11.

In determining whether substantial competent evidence supports the district court findings, appellate courts disregard any conflicting evidence or other inferences that might be drawn from the evidence. In evaluating the evidence to support the district court's factual findings, an appellate court does not weigh conflicting evidence, evaluate witnesses' credibility, or redetermine questions of fact.

12.

For Kansas income tax purposes, a resident individual is a natural person domiciled in this state. A person's domicile is that place in which a person's habitation is fixed, with no present intention of removal, and to which, whenever absent, that person intends to return. A person may have only one domicile at a time, and once shown to exist, a domicile is presumed to continue until the contrary is shown.

13.

Whether a district court erroneously applied Kansas law is a question of law subject to de novo review. Likewise, whether a district court flouted an appellate court mandate is a question of law subject to de novo review.

14.

Generally, litigants must object to the district court's failure to make adequate findings of fact and conclusions of law as required by K.S.A. 2020 Supp. 60-252 to give the district court an opportunity to correct any alleged errors. Without an objection, this court will presume the district court made all the necessary factual findings to support its judgment, though this court may consider a remand if the lack of specific findings precludes meaningful appellate review.

15.

Appellate courts generally avoid making unnecessary constitutional decisions. Thus, where there is a valid alternative ground for relief, an appellate court need not reach constitutional challenges.

Review of the judgment of the Court of Appeals in 59 Kan. App. 2d 500, 485 P.3d 679 (2021). Appeal from Crawford District Court; RICHARD M. SMITH, judge. Opinion filed May 20, 2022. Judgment of the Court of Appeals reversing the judgment of the district court is reversed. Judgment of the district court is affirmed.

*James D. Oliver*, of Foulston Siefkin LLP, of Overland Park, argued the cause, and *Jeffery A. Jordan*, of the same firm, of Wichita, and *Jeremy L. Graber*, of the same firm, of Topeka, were with him on the briefs for appellant.

*Jay E. Heidrick*, of Polsinelli PC, of Kansas City, Missouri, argued the cause, and *Miriam E. C. Bailey*, of the same firm, and *R. Dan Boulware*, pro hac vice, of the same firm, of St. Joseph, Missouri, were with him on the briefs for appellees.

The opinion of the court was delivered by

WALL, J.: This appeal is the culmination of over a decade's worth of litigation between O. Gene and Rita J. Bicknell and the Kansas Department of Revenue (KDOR). While the procedural history is complex and the evidentiary record is enormous, the controlling legal question throughout the litigation has remained relatively simple— whether Gene was a Kansas resident for tax purposes in 2005 and 2006. We hold Gene was domiciled in Florida during those years.

Gene is a successful entrepreneur with deep ties to the city of Pittsburg, Kansas. For most of his life, Gene was a legal resident of Kansas and owned a home in Pittsburg. But Gene also bought a home in Florida in the 1990s. Since 2003, Gene has claimed to be a legal resident of Florida—a state which imposes no income tax on its residents. Gene continued to earn income in Kansas after claiming Florida residency, so he began filing Kansas income tax returns as a nonresident in 2003.

Gene's tax residency status came into question sometime after he filed his 2006 Kansas income tax return. In 2006, Gene sold his largest company, NPC International, which at one time was the largest Pizza Hut franchisee in the world with 800 franchises and over 22,000 employees. If Gene was a resident of Kansas that year, he would owe millions of dollars in state income tax on the proceeds from the sale of NPC International. If not, his tax burden as a nonresident would be relatively marginal.

In 2007, KDOR launched a review of Gene's 2005 and 2006 tax returns. That desk review prompted litigation, including two trials and three appearances before the Kansas appellate courts. This third and most recent appeal arises from the Crawford County District Court's review of an order from the Board of Tax Appeals (BOTA) affirming

KDOR's determination that Gene was a Kansas resident in 2005 and 2006. After an eight-day de novo bench trial, the district court ruled that Gene was a Florida resident during the assessment period. As a result, the district court reversed BOTA's order. KDOR appealed.

In a split decision, the Court of Appeals panel reversed the district court's judgment and remanded for a new trial. The panel majority held that the district court committed reversible error by requiring KDOR to prove that Gene was a Kansas resident in 2005 and 2006. The panel majority concluded that by doing so the district court had improperly shifted the burden of proof from Gene to KDOR. The Court of Appeals also held that venue for judicial review of BOTA's order did not lie in Crawford County. Thus, the panel remanded the case to the Shawnee County District Court. Both parties petitioned for review. See *Bicknell v. Kansas Dept. of Revenue*, 59 Kan. App. 2d 500, 485 P.3d 679 (2021) (*Bicknell III*).

Today, our opinion brings some finality to this litigation by reversing the judgment of the Court of Appeals and affirming the judgment of the district court. First, as for venue, we hold that when an agency concludes that an individual is a Kansas resident for income tax purposes based on the individual's contacts with a particular Kansas county, that Kansas county is a proper venue for judicial review under the Kansas Judicial Review Act (KJRA), K.S.A. 77-601 et seq. BOTA determined Gene was a Kansas resident during the assessment period based on his contacts with Crawford County. Thus, venue was properly situated there.

Second, we hold that the district court properly placed the burden on Gene to prove a change in domicile. KDOR and the panel majority reach the contrary conclusion by focusing on several statements from the district court order. But when read in context, these statements merely explain why KDOR's evidence did not persuasively rebut Gene's

6

competing evidence that he was domiciled in Florida during the assessment period. So construed, these statements merely confirm the district court fulfilled its duty to weigh evidence, assess witness credibility, and resolve disputed issues of fact.

Finally, we conclude that the district court findings are supported by substantial competent evidence. In turn, these findings support its legal conclusion that Gene was domiciled in Florida in 2005 and 2006. We also reject KDOR's claim that the district court ruling was otherwise contrary to established Kansas law.

FACTS AND PROCEDURAL BACKGROUND

*Summary of Events Before KDOR's 2007 Desk Review*

For context, we first summarize the relevant facts that occurred before KDOR initiated its desk review. This summary is based on the evidentiary record developed at trial before the Crawford County District Court, but it is by no means a complete recitation of all facts and evidence from that proceeding.

Gene was born in 1932, and he spent most of his life in Kansas. During his professional career, Gene founded or invested in many Kansas-based businesses. By some accounts, Gene had been involved in nearly 60 businesses during his career. Most notably, he founded NPC International in Pittsburg. Gene later founded NPC Management to house employees who were not part of the "core restaurant operations" with NPC International. Gene also founded Pitt Plastics, which manufactured polyethylene bags in Pittsburg. And he owned a cattle and farming operation called Bicknell Farms.

7

Gene met his wife, Rita, in 1987, and they wed seven years later. In 1990, he and Rita decided to buy a home in Florida. Gene also owned a home in Pittsburg. The Bicknells kept both homes fully furnished, and they still owned both homes at the time of trial in 2013.

Gene testified that he first decided to become a legal resident of Florida in 1999. According to Gene, he asked his accountants for advice on what he needed to do to become a Florida resident, and they told him that "according to the statutes" he needed to: (1) have a residence; (2) register a vehicle; (3) have a driver's license; (4) register to vote; and (5) have a bank account, all in the state of Florida. Gene already owned a home and had registered a vehicle in Florida, so he obtained a Florida driver's license and registered to vote in Florida. He did not open a Florida bank account at that time.

Gene filed his 1999 Kansas income tax return as a nonresident. And, at the outset of 2000, Gene fully intended to maintain his Florida domicile. But in late 2000, Gene returned to Kansas to address unresolved business issues that could not be managed from Florida. In December 2000, Gene obtained a Kansas driver's license and registered to vote in Kansas. Gene continued to claim residency in Kansas for several years.

In August or September 2002, the Bicknells hired Joan Waters as a full-time housekeeper for their Pittsburg home, and she was still employed in this position at the time of trial. Rita testified that she and Gene hired Waters because they were not spending as much time at their Pittsburg home. Waters lived in a guest house on the property. She cleaned the house and drove the Bicknells' cars once a week to keep the batteries charged.

Gene testified that he finally decided to retire and return to Florida in January 2003. He said two major factors contributed to this decision. First, he turned 70 in September 2002. After this milestone birthday, Gene began to seriously reflect on his life and consider how he wanted to spend the rest of it. Second, Rita was diagnosed with breast cancer in December 2002. She decided to seek treatment in Florida, and Gene wanted to be with her during that time.

In 2003, Gene applied for a duplicate Florida driver's license and opened a bank account in Florida. He also began filing his Kansas income tax returns as a nonresident that year and has continued to do so ever since.

In 2004, Gene reregistered to vote in Florida. But KDOR also presented evidence that Gene renewed his Kansas driver's license that same year.

While supporting Rita during her cancer treatment in Florida, Gene began writing the music and script for a stage production called Celebrate America. Gene eventually played the lead character. Celebrate America was produced by a theater in Branson, Missouri, and ran from 2004 to 2006. The Branson show season runs from April to December, so Gene often stayed in Branson during this period.

Gene sold NPC International to Merrill Lynch in May 2006. Around that time, Gene's son, Martin "Marty" Bicknell, founded a company called Mariner Wealth Advisors (Mariner) in Overland Park. In July 2006, Gene executed a durable power of attorney in favor of Marty and Mariner to run Gene's remaining companies. Marty also assumed oversight of the Bicknells' Pittsburg house and Bicknell Farms. In January 2007, Gene began working for Mariner as a consultant.

In September 2007, KDOR launched a desk review of Gene's nonresident income tax returns for the years 2005 and 2006. As part of its review, KDOR sent the Bicknells a nonresident questionnaire requesting information and documents relevant to Gene's state of residency during that period. Gene had also filed his 2005 and 2006 tax returns jointly with Rita. But Rita claimed to be a Kansas resident through 2007, so her residency was not in dispute.

In January 2009, KDOR determined that Gene should have filed his 2005 and 2006 tax returns as a Kansas resident and issued a proposed assessment. The Bicknells pursued administrative remedies, arguing that Gene was a Florida resident during the assessment period. KDOR issued a final written determination in October 2010, concluding that Gene was a Kansas resident in 2005 and 2006 and imposing a tax bill of $42,544,676, including interest and penalties. The Bicknells appealed to the Court of Tax Appeals (COTA).

While that appeal was pending before COTA, the Bicknells also petitioned the district court for a declaratory judgment challenging the constitutionality of the applicable regulation for determining tax residency status. During the tax assessment period for the Bicknells, two regulations had been in effect. K.A.R. 92-12-4 (2006) provided a rather succinct explanation of domicile. That regulation was revoked in March 2006, and replaced by K.A.R. 92-12-4a, a far more detailed regulation that lists several factors that can be considered in determining a person's domicile for tax purposes. The Bicknells argued K.A.R. 92-12-4a was unconstitutionally vague. The district court dismissed the petition, concluding the Bicknells had not yet exhausted their administrative remedies in the COTA proceeding. The Court of Appeals affirmed the

district court ruling. See *Bicknell v. Jordan*, No. 109,720, 2014 WL 1302634, at \*1-2, 9 (Kan. App. 2014) (unpublished opinion) (*Bicknell I*).

While *Bicknell I* was pending, COTA held a six-day trial. *Bicknell I*, 2014 WL 1302634, at \*2. In December 2013, COTA issued its decision affirming KDOR's tax assessment. In its decision, COTA explained it "place[d] no particular reliance for [its] decision" on K.A.R. 92-12-4 and K.A.R. 92-12-4a, because those regulations could not "abridge, enlarge, or modify the substantive law of domicile as embodied in the statutes and case authorities of this state." Instead, COTA relied on "Kansas statutory law and case law, including the recapitulation of the common law contained in the Restatement (Second) of Conflict of Laws as approved in [*In re Estate of*] *Phillips*[, 4 Kan. App. 2d 256, 604 P.2d 747 (1980)]."

The Bicknells appealed COTA's order to the Court of Appeals, arguing that COTA erred by ignoring K.A.R. 92-12-4 and K.A.R. 92-12-4a in its decision. In a split decision, the Court of Appeals agreed with the Bicknells. The majority vacated COTA's decision and remanded the case to COTA with directions to "consider K.A.R. 92-12-4 and K.A.R. 92-12-4a along with controlling statutory law and caselaw in determining Gene's tax-residency status for the years 2005 and 2006." *In re Tax Appeal of Bicknell*, No. 111,202, 2015 WL 5613069, at \*10 (Kan. App. 2015) (unpublished opinion) (*Bicknell II*).

By the time the Court of Appeals had remanded the Bicknells' case, the Kansas Legislature had replaced COTA with BOTA. L. 2014, ch. 141, § 1; K.S.A. 2014 Supp. 74-2426. Thus, BOTA considered the case on remand.

In October 2017, BOTA issued a written summary decision, as permitted by K.S.A. 74-2426(a), concluding that Gene was a Kansas resident during the assessment period:

11

"After application of the applicable KDOR regulations, statutes and caselaw, to the record evidence, pursuant to the instructions of the Kansas Court of Appeals, the Board finds that the Taxpayers [have] not presented evidence to satisfy their burden to show by satisfactory proof that Mr. Bicknell acquired a new domicile in the State of Florida during the period at issue."

The Bicknells petitioned for review of BOTA's summary decision in the Crawford County District Court. Relying on K.S.A. 74-2426(c)(4)(B), the district court conducted a trial de novo, meaning that it did not defer to BOTA's summary decision.

At trial, both parties presented testimony from several witnesses and admitted copious amounts of documents into evidence. This evidence clearly established that Gene had made many formal representations that he had been a Florida resident since 2003—not only through actions such as obtaining a Florida driver's license but also by claiming Florida residency or listing a Florida home address in testamentary documents, tax documents, and business filings. Gene claimed that these representations, along with other evidence he presented at the de novo trial, proved he became a Florida resident in 2003. KDOR argued these formal representations showed only that Gene wanted to create the appearance of Florida residency, but his actions proved he remained a Kansas resident through at least 2006.

After an eight-day trial, the district court ruled for the Bicknells, concluding that Gene was domiciled in Florida during the assessment period. Given the abundance of conflicting evidence presented at trial and the many findings and conclusions set forth in the district court's 53-page "Decision and Journal Entry of Judgment" (Order), we discuss those most relevant to the issues on appeal in the Analysis section of this opinion.

KDOR appealed the district court ruling. In a split decision, the Court of Appeals reversed and remanded the matter to the district court. The majority held that the district court had correctly determined that it must hold a trial de novo and determine issues of law and fact anew (without deference to BOTA) under the 2016 amendments to K.S.A. 74-2426(c)(4)(B). *Bicknell III*, 59 Kan. App. 2d at 512-25. But the majority held that the district court had erroneously shifted the burden onto KDOR to disprove Gene's Florida domicile for the 2005 and 2006 tax years. 59 Kan. App. 2d at 504-12. The majority also held that the district court had erroneously concluded that Crawford County was a proper venue for the Bicknells' action. 59 Kan. App. 2d at 532.

Chief Judge Arnold-Burger concurred in part and dissented in part. She agreed with the majority that the district court did not err in holding a trial de novo. 59 Kan. App. 2d at 548 (Arnold-Burger, C.J., concurring in part and dissenting in part). She also agreed that Crawford County was an improper venue for the Bicknells' action but concluded the venue error was harmless. 59 Kan. App. 2d at 548-50 (Arnold-Burger, C.J., concurring in part and dissenting in part). She also concluded that the district court did not shift the burden of proof—it merely commented on the weight of the parties' evidence. 59 Kan. App. 2d at 532-48 (Arnold-Burger, C.J., concurring in part and dissenting in part). Finally, Chief Judge Arnold-Burger would have held that substantial competent evidence supported the district court findings and its ruling that Gene was domiciled in Florida during the assessment period. Thus, she would have affirmed the district court's judgment. 59 Kan. App. 2d at 571-82 (Arnold-Burger, C.J., concurring in part and dissenting in part).

The Bicknells petitioned for review, challenging the panel majority's holding on venue and burden shifting. The Bicknells also sought review of the issues raised by KDOR but not reached by the majority. Finally, the Bicknells sought review of their constitutional challenge to K.A.R. 92-12-4a.

13

KDOR filed a conditional cross-petition for review claiming the Court of Appeals decision was right for other reasons not addressed by the majority. KDOR also asked this court to enter judgment as a matter of law in its favor because the Bicknells had failed to overcome the spousal presumption in K.A.R. 92-12-4a(b)(5).

We granted the Bicknells' petition and KDOR's conditional cross-petition. K.S.A. 20-3018(b). Jurisdiction is proper. K.S.A. 60-2101(b).

ANALYSIS

To resolve the issues raised by the parties in this appeal, we first address the panel majority's holding on the question of venue. Then, we turn to its burden-shifting holding. Next, we evaluate KDOR's claim that the district court findings are not supported by substantial competent evidence. Finally, we analyze KDOR's other legal challenges raised but not decided by the panel and address the Bicknells' constitutional challenge.

I.  *The District Court Did Not Err by Denying KDOR's Motion to Dismiss for Lack of Venue and KDOR's Motion to Change Venue to Shawnee County*

The Bicknells petitioned for judicial review of BOTA's order in Crawford County, where Pittsburg is located. KDOR moved to dismiss the Bicknells' petition under K.S.A. 2020 Supp. 60-212(b)(3), arguing venue did not lie in Crawford County. Alternatively, KDOR requested a change of venue to Shawnee County. After a hearing on the motion, the district court ruled that venue was proper in Crawford County because BOTA's order was effective there. The district court also denied KDOR's request to transfer venue to Shawnee County after finding Crawford County to be the more convenient forum.

14

On appeal, KDOR renewed its venue challenge. The Bicknells claimed the issue was not preserved for appeal because KDOR did not include a transcript of the motion hearing as part of the record on appeal. They also claimed the district court correctly decided the issue on the merits. The Court of Appeals rejected the preservation challenge. 59 Kan. App. 2d at 526-27. And it concluded that venue did not lie in Crawford County. 59 Kan. App. 2d at 531-32. On review, the Bicknells argue the Court of Appeals erred in rejecting the preservation challenge and by reversing the district court on the merits of the venue challenge.

A. *Standard of Review*

KDOR moved to dismiss the Bicknells' petition for improper venue under K.S.A. 2020 Supp. 60-212(b)(3). When considering whether plaintiff has made a showing sufficient to overcome a motion to dismiss for improper venue, the court accepts as true the uncontroverted allegations in the petition and resolves all disputed facts in the light most favorable to plaintiff. *Wachter Management Co. v. Dexter & Chaney, Inc.*, 282 Kan. 365, 368, 144 P.3d 747 (2006). We review the district court's decision on such motions using a de novo standard of review. 282 Kan. at 368.

Here, neither party offered supporting affidavits or deposition testimony in connection with KDOR's motion to dismiss. Instead, the parties largely advanced legal arguments addressing the propriety of venue in Crawford County under K.S.A. 77-609(b), the KJRA venue provision. Whether venue is proper under the KJRA is a question of law subject to unlimited review. *Rhodenbaugh v. Kansas Employment Sec. Bd. of Review*, 52 Kan. App. 2d 621, 625, 372 P.3d 1252 (2016); see also *Mosier v. Farren*, 731 Fed. Appx. 808, 810 (10th Cir. 2018) (unpublished opinion) ("We review de novo whether venue was proper [because that determination is an interpretation of the

venue statute]."). If the issue requires us to interpret the KJRA venue statute, our review is also unlimited. *In re Tax Appeal of Lemons*, 289 Kan. 761, 762, 217 P.3d 41 (2009).

In the alternative, KDOR asked the court to transfer venue to Shawnee County under K.S.A. 60-609(a). We apply a deferential standard of review to a lower court's decision to change or not to change venue, and we do not disturb the ruling absent a showing of an abuse of discretion. *Matson v. Kansas Dept. of Corrections*, 301 Kan. 654, 656, 346 P.3d 327 (2015); *State v. Higgenbotham*, 271 Kan. 582, 591, 23 P.3d 874 (2001).

B. *KDOR Preserved the Issue for Review*

Before reaching the merits, we first address the Bicknells' preservation argument. As the party asserting district court error on this issue, KDOR has the burden to designate a record sufficient to present its facts and arguments to the appellate courts and to establish its claims. See *Friedman v. Kansas State Bd. of Healing Arts*, 296 Kan. 636, 644, 294 P.3d 287 (2013). Quite simply, KDOR must develop a record that enables appellate courts to conduct meaningful review of the issue. See *Breedlove v. State*, 310 Kan. 56, 60, 445 P.3d 1101 (2019).

In its "Journal Entry Regarding Kansas Department of Revenue's Motion to Dismiss," the district court said it had "considered the written submissions by the parties, and heard oral argument." The Bicknells contend the district court's reference to oral argument proves that the transcripts from the motion hearing are required for meaningful review. The Bicknells liken this case to *AkesoGenX Corp. v. Zavala*, 55 Kan. App. 2d 22, 407 P.3d 246 (2017). There, defendant moved to set aside a default judgment. After conducting a hearing, the district court denied the motion. In the journal entry of judgment, the district court stated only that the motion was denied for the reasons stated

16

on the record. On appeal, defendant failed to include a transcript of the motion hearing as part of the record. The Court of Appeals held that defendant failed to designate a record establishing prejudicial error. 55 Kan. App. 2d at 42.

But unlike *AkesoGenX*, here the district court's journal entry of judgment does not merely cite the hearing transcript as support for its decision. Rather, the district court's journal entry addresses each of the arguments KDOR advanced in support of dismissal, including its venue challenge. There is no indication the district court arrived at its decision based on issues or information outside the pleadings and motions in the record. Nor do the Bicknells make such a claim. The Bicknells do note that the district court asked questions at the motion hearing about a sizable tax deposit they paid rather than posting an appellate bond under K.S.A. 75-5153. But the district court does not mention this issue when addressing the venue challenge in its journal entry. And there is no other indication these questions factored into the ruling.

Because we have the same access to the factual allegations in the Bicknells' petition and the arguments each party advanced in their briefing, we are in just as good a position as the district court to address the merits. Thus, we agree with the Court of Appeals that KDOR adequately preserved the issue for appeal.

C. *Venue Was Proper in Crawford County*

In civil cases, venue is a procedural matter, not a jurisdictional one. *Shutts, Executor v. Phillips Petroleum Co.*, 222 Kan. 527, 546, 567 P.2d 1292 (1977). The KJRA's venue provision, K.S.A. 77-609(b), governs the proper venue for judicial review of an agency order. That statute provides that "venue is in the county in which the order or agency action is *entered or is effective* or the rule and regulation is promulgated."

(Emphasis added.) K.S.A. 77-609(b). Thus, under the plain language of K.S.A. 77-609(b), venue may properly lie in more than one county. *Rhodenbaugh*, 52 Kan. App. 2d at 626.

"Where venue for a KJRA proceeding is proper in more than one county, the district court should give due consideration to the plaintiff's right to choose the place of the action" when ruling on a change of venue motion. 52 Kan. App. 2d at 628. The district court may also consider which forum better serves the convenience of the parties and witnesses and the interests of justice. See K.S.A. 60-609(a). "'But unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed.'" *Gonzales, Administrator v. Atchison, T. & S. F. Rly. Co.*, 189 Kan. 689, 693, 371 P.2d 193 (1962).

BOTA's order was entered in Shawnee County, so venue was proper there. But this conclusion does not end the analysis. Instead, we must determine (1) whether venue would also lie in Crawford County under K.S.A. 77-609(b), and (2) if so, whether the district court erred by refusing KDOR's request to transfer venue to Shawnee County.

To answer the first question, we must determine whether BOTA's order was "effective" in Crawford County. See K.S.A. 77-609(b). The Bicknells argue that BOTA's order is effective in Crawford County because it imposes "continuing burdens and risks" on their interests there. As the Bicknells see it, the only way they can avoid more tax assessments is to sever all ties with Crawford County.

The Court of Appeals held that BOTA's order was not "effective" in Crawford County. The panel reasoned that BOTA's determination that Gene was a Kansas resident in 2005 and 2006 was simply a reflection of Kansas domicile law and did not alter Gene's ability to visit or operate in Crawford County. *Bicknell III*, 59 Kan. App. 2d at 530. It

18

added that Gene alleged in his petition for judicial review that he lived in Florida in 2017, the year BOTA issued its order. 59 Kan. App. 2d at 530. The panel thus concluded that the district court erred in finding Crawford County was a proper venue because "Gene does not live in Crawford County nor has he shown that the order will have any particular effect on him there." 59 Kan. App. 2d at 532.

In reaching this holding, the Court of Appeals relied on two Kansas Court of Appeals decisions addressing venue under the KJRA. First, in *Karns v. Kansas Bd. of Agriculture*, 22 Kan. App. 2d 739, 742, 923 P.2d 78 (1996), the Court of Appeals held that an agency order denying a crop duster's business license and revoking his commercial applicator certification would be effective in any county in which the crop duster had been operating. And in *Rhodenbaugh*, the Court of Appeals held that an agency order denying unemployment benefits to a nurse would be effective in the county where the nurse lived and would have received her benefits. 52 Kan. App. 2d at 628. The Court of Appeals found that "the facts the Bicknells rely on are far removed from those in [*Karns* and *Rhodenbaugh*]." *Bicknell III*, 59 Kan. App. 2d at 529.

We agree that the facts here differ from those in *Karns* and *Rhodenbaugh*, but we do not find that difference to be dipositive. While both *Karns* and *Rhodenbaugh* explain how to determine whether venue lies in a particular county under K.S.A. 77-609(b), neither case definitively establishes when an order may be considered "effective" under the statute.

We conclude that the particular facts of this case establish that BOTA's order was "effective" in Crawford County under K.S.A. 77-609(b). BOTA's order, which KDOR attached to its motion to dismiss, determined that Gene was a Kansas resident and that he needed to pay income taxes as a Kansas resident. That residency determination hinged on Gene's former contacts with Crawford County. When an agency determines that an

19

individual is a Kansas resident for income tax purposes based on his or her connections to or contact with a particular Kansas county, a sufficient nexus exists between the order and that county to render the order "effective" there. Thus, no matter where Gene was domiciled in 2017, BOTA's determination that he was a Kansas resident based on his connections to or contact with Crawford County provided a basis for venue there.

Based on this analysis, venue was proper in either Shawnee County or Crawford County under K.S.A. 77-609(b). This conclusion leads us to the second question: whether the district court still erred in denying KDOR's request to transfer venue to Shawnee County. While the KJRA contains no provision for transferring venue, the Code of Civil Procedure does. And "the Code of Civil Procedure may be used by the district court to supplement the KJRA if the provision is a logical necessity that is not addressed within the KJRA." *Pieren-Abbott v. Kansas Dept. of Revenue*, 279 Kan. 83, 97, 106 P.3d 492 (2005). Under K.S.A. 60-609(a), "[u]pon the motion of a party, a district court may transfer any civil action to any county where it might have been brought upon a finding that a transfer would better serve the convenience of the parties and witnesses and the interests of justice."

The district court denied KDOR's request for a change of venue, finding Crawford County was the more convenient forum for the parties and witnesses. KDOR does not contest this finding on appeal. Thus, KDOR has failed to show the district court ruling was based on an error of fact, an error of law, or otherwise constituted an abuse of discretion. See *State v. Burnett*, 293 Kan. 840, 853, 270 P.3d 1115 (2012) ("The party asserting an abuse of discretion bears the burden of showing such an abuse of discretion."); see also *Lambertz v. Abilene Flour Mills Company, Inc.*, 209 Kan. 93, 96, 495 P.2d 914 (1972) ("[V]enue should not be transferred to another county unless there is some compelling reason for doing so.").

20

In sum, we hold that venue for these proceedings was proper in Crawford County under K.S.A. 77-609(b) because BOTA's order found Gene to be a Kansas resident based on his contacts with Crawford County, rendering the order "effective" there under the statute. Thus, the district court did not err in denying KDOR's motion to dismiss the petition for improper venue under K.S.A. 2020 Supp. 60-212(b)(3). KDOR also failed to show the district court abused its discretion by denying KDOR's request to transfer venue to Shawnee County under K.S.A. 60-609(a). For these reasons, we reverse the Court of Appeals' holding on the venue issue.

## II.  *The District Court Did Not Improperly Shift the Burden of Proof onto KDOR*

Next, KDOR argues the district court impermissibly shifted the burden to KDOR to prove Gene was a Kansas resident during the assessment period (or to disprove Gene's contention that he was a Florida resident in 2005 and 2006). To support its position, KDOR highlights several excerpts from the district court's 53-page "Decision and Journal Entry of Judgment" (Order). In these excerpts, the district judge said KDOR had failed to offer evidence to support its position or words to that effect. KDOR believes these statements prove the district court improperly shifted the burden of proof.

The Court of Appeals majority agreed. *Bicknell III*, 59 Kan. App. 2d at 504-12. But Chief Judge Arnold-Burger concluded these excerpts from the district court Order merely reflected the court's weighing of the evidence, not improper burden shifting. 59 Kan. App. 2d at 532-48 (Arnold-Burger, C.J., concurring in part and dissenting in part).

On review, the Bicknells argue the Court of Appeals erred for the reasons Chief Judge Arnold-Burger discussed in her dissent. KDOR relies on the rationale of the panel majority. KDOR also claims it is entitled to judgment as a matter of law under the

21

applicable burden of proof because the Bicknells failed to overcome the spousal presumption in K.A.R. 92-12-4a(b)(5).

A. *Standard of Review and Relevant Legal Framework*

Whether the district court erroneously shifted the burden of proof is a question of law subject to unlimited review. See *Becker v. Knoll*, 291 Kan. 204, 212, 239 P.3d 830 (2010) ("The Court of Appeals should have applied a de novo standard to review whether the district court properly applied the law—the shifted burden of proof—to the facts."); *Fischer v. Kansas Dept. of SRS*, 271 Kan. 167, 175, 21 P.3d 509 (2001) ("The determination of which party shall bear the burden of proof is a question of law and, therefore, this court's review is unlimited.").

The party asserting an agency action is invalid bears the burden of proving the invalidity. K.S.A. 77-621(a)(1); see also *In re Tax Appeal of The Kroger Co.*, 270 Kan. 148, 150, 12 P.3d 889 (2000) (party challenging BOTA's action has burden to prove action was erroneous). And the burden of proof remains with that party throughout the proceedings. *Jensen v. Jensen*, 205 Kan. 465, 467, 470 P.2d 829 (1970) ("The burden of proof is always upon the party asserting an affirmative of an issue and remains with him throughout the trial."). Furthermore, a party claiming a change of domicile has the burden of proving the existence of the new domicile. *In re Estate of Phillips*, 4 Kan. App. 2d 256, 265, 604 P.2d 747 (1980). Generally, a person must show the concurrence of two facts to establish a change of domicile—physical presence in a new location and an intent to remain in that location, either permanently or indefinitely. 4 Kan. App. 2d at 260-61.

B. *The District Court Applied the Appropriate Burden of Proof and Held Gene to It*

Here, the parties agree that Gene had the burden to prove that BOTA's decision was erroneous. Neither party disputes the district court finding that Gene was once domiciled in Pittsburg, Kansas. And Kansas law provides that when a residence is established it is presumed to continue until proven otherwise. See *Arnette v. Arnette*, 162 Kan. 677, 680, 178 P.2d 1019 (1947); K.A.R. 92-12-4a(b)(2) ("[A] domicile shall be presumed to continue until the contrary is shown."). Thus, the burden was on Gene to prove that his Kansas residency had changed to Florida in 2005 and 2006. To resolve the issue on review, we must decide whether the district court impermissibly shifted this burden by requiring KDOR to prove that Gene was not domiciled in Florida during the assessment period, rather than holding Gene to his burden to prove that he was.

After scrutinizing the Order and analyzing the challenged statements in their proper context, we conclude that the district court properly placed the burden of proof on Gene to establish his residency in Florida during the assessment period. The district court expressly acknowledged Gene's burden of proof in the Order and remained mindful of it throughout its ruling. Then the district court found that Gene had met his burden to prove that he was domiciled in Florida during the assessment period. The Order also (1) found that KDOR failed to *rebut* some of Gene's evidence and (2) explained the district court's rationale for adopting Gene's evidence over KDOR's.

KDOR's challenge and the panel majority's holding is founded on these latter two categories of statements in the Order. But on closer inspection, these challenged excerpts merely confirm that the district court fulfilled its duty to weigh the competing evidence, assess the credibility of witnesses, and resolve disputed issues of fact. To support this conclusion, in the rest of this section we analyze the four corners of the Order to determine whether the district court understood and held Gene to the appropriate burden

23

of proof under Kansas law. Then, in the following section, we address each of the excerpts from the Order that the panel majority relied on to reach its burden-shifting conclusion. Finally, we address KDOR's claim that it is entitled to judgment as a matter of law because the Bicknells failed to overcome the spousal presumption in K.A.R. 92-12-4a(b)(5).

It is apparent from the four corners of the Order that the district court was aware of the appropriate burden of proof and held Gene to that burden. In the Order, the district court confirmed "'the burden of establishing a change of domicile is upon the party who asserts it,'" i.e., Gene. After finding that Gene was previously domiciled in Kansas, the district court again recognized that it was "incumbent upon Gene to demonstrate that he had met the necessary criteria as established by his actions and statements to establish" domicile in another jurisdiction.

The district court then concluded that Gene had met this burden by "clear evidence." In fact, each time the district court found that a relevant factor supported a finding of domicile in Florida, it recounted the evidence Gene presented in support of that finding. And throughout the decision, the district court repeatedly stated that it was convinced by clear evidence or beyond any doubt that Gene was domiciled in Florida.

Thus, the district court knew that Kansas law placed the burden on the Bicknells to prove Gene had changed his domicile to Florida. And its weighing of the competing evidence confirms the district court held the Bicknells to this burden. We now turn to the statements in the Order that the panel majority relied on to reach the opposite conclusion.

24

C. *Viewed in Context, the Challenged Statements in the Order Reflect the District Court's Appropriate Weighing of the Evidence, Not Improper Burden-Shifting*

The Court of Appeals majority found the Order to be "replete with examples" where the district court improperly shifted the burden of proof. *Bicknell III*, 59 Kan. App. 2d at 506. In reaching this conclusion, the majority highlights several excerpts from the Order where the district court commented on KDOR's lack of evidence. 59 Kan. App. 2d at 506-07.

But when viewed in context, the statements merely explained why the district court determined that KDOR had failed to persuasively *rebut* Gene's "clear evidence" of Florida domicile in 2005 and 2006. So construed, the district court's analysis is not properly characterized as improper burden shifting. To support this conclusion, we address in turn each statement the panel majority relied on.

1. *The District Court Did Not Shift the Burden of Proof by Commenting on KDOR's Failure to Produce Witnesses to Rebut Gene's Evidence Establishing His Absence From Pittsburg*

First, the Court of Appeals cites language in the Order stating: "'Despite KDOR's obvious expenditure of considerable resource and effort, *the department produced no witnesses who contradicted this testimony* [about Gene's absence from Kansas].'" (Emphasis added). 59 Kan. App. 2d at 505. The panel majority believes this passage shows improper burden shifting because the district court required the agency "to produce a witness who would testify that Gene was perpetuating a 'sham' when he contended that he had left his Kansas domicile to establish a domicile in Florida." 59 Kan. App. 2d at 506. But viewed in context, the cited portion of the Order fails to support the panel majority's legal conclusion.

25

The quoted passage is found within a section of the Order where the district court made particularized findings and conclusions under K.A.R. 92-12-4a(b)(7), a KDOR regulation identifying "factors [that] may be considered in determining whether or not a person's domicile is in this state for the tax years in question." Those factors include the percentage of time that the person is physically present within the state of Kansas and other jurisdictions under K.A.R. 92-12-4a(b)(7)(A), along with the location of the person's domicile for prior years under K.A.R. 92-12-4a(b)(7)( B).

In this section of the Order, the district court began by analyzing the evidence the Bicknells offered on these two factors. Then, under a separate section in the Order entitled "Excurses on credibility—absence from Pittsburg," the district court addressed the credibility of the witnesses who offered testimony relevant to K.A.R. 92-12-4a(b)(7)(A). There, the district court found that Gene's absence from Pittsburg during the relevant period was "credibly described by witnesses." The district court noted that some of these witnesses testified from their personal knowledge, while others testified that knowledge of the "Bicknell[s'] move to Florida" was "so pervasive as to constitute a matter of community awareness."

The district court then addressed KDOR's credibility challenge to these witnesses. KDOR tried to impeach their credibility by arguing they were all close friends or business associates of Gene, or members of the Bicknell family, and therefore biased. The district court rejected this argument on two grounds. First, it observed that those "most likely to have reliable knowledge" of Gene's location during the relevant period are his closest friends, business associates, and family. Second, the district court found that other evidence tended to corroborate the testimony of the witnesses who described Gene's absence from Pittsburg.

The district court made the challenged statement (which the panel majority relied on to establish improper burden shifting) in connection with this second rationale. Read in context, the Order states:

> "Second, is this testimony inconsistent with the behavior or actions of Gene and Rita? In other words, is the external evidence corroborating or contradictory? Gene, and Rita for that matter, never claimed they were never present in Pittsburg. They never claimed they cut all ties to the community and interests Gene had invested much time and resources in. The external evidence of hiring a full-time house sitter [for the home in Pittsburg] tends to corroborate. Despite KDOR's obvious expenditure of considerable resource and effort, the department produced no witnesses who contradicted this testimony. In fact, the KDOR 'star' witness for the concept of Kansas residency[, the driver's license specialist who helped Gene renew his Kansas license in 2004,] testified that Gene is a celebrity. If that's true and Gene continued to live in Pittsburg, it seems likely that in the last 10 years a witness would develop to testify this is a sham. It is prudent to resist total reliance on the absence of evidence for the proof of anything. Still, this is a deafening silence."

This passage illustrates how the district court assessed the credibility of Gene's witnesses and weighed the evidence relevant to K.A.R. 92-12-4a(b)(7)(A). As part of its credibility determination, the district court reasoned that if Gene's witnesses were indeed biased, some other witness could have provided conflicting testimony or KDOR could have relied on other evidence to impeach Gene's witnesses, particularly given Gene's prominence in the Pittsburg community. Yet KDOR produced no such witness or evidence. The district court also found that other evidence tended to corroborate the testimony of Gene's witnesses, who generally testified to Gene's absence from Pittsburg during the assessment period, thereby bolstering their credibility.

Contrary to the panel majority's conclusion, the district court did not place the burden of proof on KDOR in this part of the Order. Instead, the district court merely explained the rationale for its credibility determinations and the weight it assigned to the evidence relevant to K.A.R. 92-12-4a(b)(7)(A).

    2.    *The District Court Did Not Shift the Burden of Proof by Commenting on the Lack of Evidence that Gene's Motive Was to Avoid Kansas Tax Liability*

Second, the panel majority based its burden-shifting conclusion, in part, on language in a section of the Order where the district court made general findings about Gene's domiciliary motive and intent:

> "'The parties' stipulation that Gene did not intend to commit tax fraud did not totally dissuade KDOR from making suggestions seemingly at odds with this stipulation, insinuated at times during the trial and argued more subtlety in closing arguments. KDOR implied Gene's behavior might place on a morality spectrum somewhere between evasive and unseemly so long as such classification falls short of alleging criminal tax fraud. This is pointed out, not to criticize KDOR, but to acknowledge for the record the court's consideration of KDOR's suggestions of improper intent.

> "'After processing the evidence relevant to motive, this court concludes throughout the period of 2005, 2006, and the years immediately preceding Gene's motives regarding domicile were sincere. *There is no evidence* Kansas income tax avoidance was a motivating factor. There is some evidence of inquiring about tax consequences. Gene being oblivious to tax implications is not believable. Nevertheless, *there's no evidence* of an intentional scheme to move to Florida to avoid the taxes now claimed. Even the implications of the language "tax avoidance" cast greater negative aspersions on Gene's motives than the evidence warrants. This is not a situation where the evidence supports a design or plan on the part of Gene to purposefully deprive the State of Kansas of revenue to which they were rightfully entitled. To borrow a phrase from

28

equity his "hands are clean." If the contrary were true, the court would have been much more likely to construe evidence in favor of KDOR and against Gene when appropriate.'" (Emphases added.) 59 Kan. App. 2d 507.

The panel majority believes the district court shifted the burden to KDOR by requiring it "to prove or show that Gene was motivated to change his domicile to Florida for the purpose of avoiding or reducing his Kansas income tax liability for the tax years 2005 and 2006." 59 Kan. App. 2d at 507.

But again, viewed in context, the passage reflects the district court's thoughtful weighing of the evidence and assessment of credibility. While not dispositive, Gene's motive for becoming a Florida resident is relevant to whether he possessed the requisite intent for a change of domicile. See *Phillips*, 4 Kan. App. 2d at 264; see also *Williamson v. Osenton*, 232 U.S. 619, 625, 34 S. Ct. 442, 58 L. Ed. 758 (1914) (domiciliary motive matters when "there is an issue open on the intent"). Gene's motive for establishing domicile in Florida was also important to the district court's credibility assessment. See *Heinz v. Havelock*, 757 F. Supp. 1076, 1081 (C.D. Cal. 1991) ("[T]he court may consider evidence of motive in evaluating the honesty of defendants' asserted intention to establish a new domicile."). As the district court explained, if the evidence showed Gene had engaged in an intentional scheme to avoid paying Kansas income taxes, then his testimony would be far less credible and his evidence entitled to little weight.

Gene's motive was a primary point of contention between the parties. The Bicknells' evidence suggested Gene was motivated to retire to his Florida residence based on thoughtful life reflection after he turned 70 and his wife's decision to seek cancer treatment in Florida. While KDOR presented no direct evidence that Gene intentionally schemed to evade Kansas taxes, it argued that the most reasonable inference to be drawn from other circumstantial evidence was that Gene's genuine motive was tax avoidance.

29

The district court properly addressed these disputed facts in the cited passage. "After processing the evidence relevant to motive," the district court found that "throughout the period of 2005, 2006, and the years immediately preceding[,] Gene's motives regarding domicile were sincere." And while Gene had asked about the tax consequences of changing domicile, the district court found it was not reasonable to infer from this evidence an intentional scheme to avoid Kansas taxes. Thus, the district court found there was "no evidence of an intentional scheme to move to Florida to avoid the taxes now claimed."

Had the Bicknells offered no evidence of Gene's good-faith motive, then the panel majority's objection to the cited passage may have been more persuasive. But that is not what happened. Instead, the Bicknells introduced evidence supporting the sincerity of Gene's good-faith motive to change domicile. The district court then weighed that evidence against the arguments and evidence KDOR advanced. Ultimately, the district court found Gene's evidence to be more persuasive. Thus, the passage cited by the panel majority merely confirms that the district court properly weighed the competing evidence and resolved this disputed issue of fact in Gene's favor.

We find more support for this conclusion in the paragraph immediately following the passage cited by the panel majority, where the district court explained:

> "The lack of evidence suggesting a motive or desire to effectuate a change in domicile to Florida merely for tax avoidance together with Gene's contemporaneous actions and statements, the facts and circumstances then in existence, and Gene's testimony regarding his intent combined to convince the court by clear proof that [Gene had] a bona fide intention to . . . establish Florida as his residence and domicile."

Read in context, the challenged remarks reflect the district court's weighing of the evidence as it held Gene to the proper burden of proof.

30

3. *The District Court Did Not Shift the Burden of Proof by Requiring KDOR to Prove Rita Was a Kansas Resident; KDOR is Not Entitled to Judgment as a Matter of Law*

Finally, the Court of Appeals cites a portion of the Order in which the district court addresses the spousal presumption under K.A.R. 92-12-4a(b)(5). The regulation provides:

"[T]here shall be a presumption that the place where a person's family is domiciled is that person's domicile. *The domicile of a person who is married shall be the same as the person's spouse unless there is affirmative evidence to the contrary, the husband and wife are legally separated, or the marriage has been dissolved.* When a person has made a home at any place with the intention of remaining there indefinitely and the person neither lives at the home in which the person's family lives nor intends to do so, then that person shall be deemed to have established a domicile separate from that person's family." (Emphasis added.) K.A.R. 92-12-4a(b)(5).

Under this provision, spouses who are still married and not legally separated are presumed to have the same domicile, but that presumption may be rebutted by "affirmative evidence to the contrary."

While Gene's state of residency has been highly contested, the Bicknells have maintained throughout these proceedings that Rita remained a Kansas resident until she claimed Florida residency in 2008. Yet Rita testified at trial that she had been living with Gene in Florida since 2003. Rita explained she did not immediately claim Florida residency then because she was not ready to end her involvement with certain professional, political, and charitable activities in Kansas. But she testified that she still spent most of her time in Florida between 2003 and 2008.

31

Because Gene and Rita were married and not legally separated, the district court considered the spousal presumption in determining Gene's domicile. In the Order, the district court acknowledged the presumption but found "[t]he evidence . . . overcomes [the presumption] by clear and convincing proof." The district court then explained:

"Rita did not become a Florida resident until 2008. Up to this point in time she intended to maintain Kansas residency to maintain her law license and to be able to maintain a more active role in Kansas politics than possible as a non-resident. Rita's domicile is irrelevant to the ultimate issues in the tax matter except as it relates to the location of Gene's domicile.

"Whether Rita would pass a scrutiny as intense as the scrutiny of Gene's residence might seem immaterial but it is quite relevant. One thing is certain. Only Rita's desire would weigh in favor of Kansas. No other element of domicile has been sufficiently demonstrated by the evidence. This court is not convinced her domicile during the subject time was Kansas. The evidence suggests it was Florida.

"Admittedly, she has not been the focus of this litigation. The regulation is not specific as to which spouse may control the other. Before the court assigns her spouse's domicile based upon hers *there ought to be some degree of proof she maintained a Kansas residency*. That doesn't exist to the degree necessary to impute it to her spouse. Based on the evidence before this court, considering the parties, their relationship and activities, if one spouse's residency creates a presumption as to the residency of the other, Gene's residency would create a presumption as to Rita's but not the other way around." (Emphasis added.)

Again, the Court of Appeals majority believes this excerpt from the Order is evidence of improper burden shifting. It noted that only Gene's domicile was in dispute and Gene had the burden to "prove that he had established a domicile separate and *apart* from Rita's Kansas domicile." *Bicknell III*, 59 Kan. App. 2d at 511. The panel majority held that the district court shifted the burden of proof by stating "'there ought to be some

32

degree of proof [Rita] maintained a Kansas residency. That doesn't exist to the degree necessary to impute it to her spouse.'" 59 Kan. App. 2d at 511.

The district court's comments and findings about the proof of Rita's domicile do not support the panel majority's burden-shifting conclusion. Generally, before a presumption is applied, the factual predicate supporting that presumption must be established. See *Dunlap v. Ribicoff*, 207 F. Supp. 511, 514 (D. Kan. 1962) (even with a statutory presumption a proper and sufficient fact predicate is essential). So, in this sense, the district court's comment that "[t]here ought to be some degree of proof [Rita] maintained a Kansas residency" is accurate. This is the factual predicate that must be established to invoke the spousal presumption within K.A.R. 92-12-4a(b)(5).

Matters become complicated here only because the district court made fact-findings seemingly inconsistent with its determination that there was insufficient proof of Rita's Kansas domicile. For instance, earlier in the Order, the district court recognized that "it is undisputed that Rita was domiciled in Kansas until at least 2008." Likewise, in analyzing the spousal presumption, the district court again noted that "Rita did not become a Florida resident until 2008. Up to this point in time she intended to maintain Kansas residency." The district court's recognition that Rita was a Kansas resident until 2008 seemingly conflicts with its statement that there is insufficient proof that Rita was a Kansas resident in 2005 and 2006.

Even so, this inconsistency does not constitute reversible error. First, the district court's comments were intended to highlight an ambiguity in the spousal presumption regulation. That is, if one were to rely on Gene's residency, rather than Rita's, in applying the presumption, then one could presume Rita was also a Florida resident. And the evidence would support this conclusion because it showed Rita was physically present in Florida throughout 2005 and 2006, even though she claimed Kansas residency until 2008.

33

Second, focusing on the inconsistent findings about the proof of Rita's domicile slights a more important district court finding. Before the district court made the challenged comments about Rita's domicile, it found that Gene had overcome the spousal presumption "by clear and convincing proof." In other words, although KDOR invoked the spousal presumption based on Rita's purported residency in Kansas, the Bicknells provided "affirmative evidence to the contrary" sufficient to overcome this regulatory presumption. K.A.R. 92-12-4a(b)(5).

Viewed in this context, the challenged statements in the Order merely provided the district court with a second, independent reason why the spousal presumption was not outcome determinative in this case. Even if we were to characterize the district court's inconsistent findings about Rita's domicile as error, it would be harmless because the district court had already determined that Gene's evidence overcame the spousal presumption irrespective of Rita's domicile. See *Landrum v. Taylor*, 217 Kan. 113, 117, 535 P.2d 406 (1975) ("Even if findings appear to be inconsistent, the decision of the trial court may be sustained on the basis of those findings which allow the conclusion reached by the court below, if they are supported by evidence."); *Phillips*, 4 Kan. App. 2d at 262.

Also, we disagree with KDOR's argument, which the panel majority adopted, that the only way Gene could overcome the spousal presumption under K.A.R. 92-12-4a(b)(5) was to prove he lived apart from Rita in Florida. *Bicknell III*, 59 Kan. App. 2d at 511. Barring such evidence, KDOR claims it is entitled to judgment as a matter of law. But this argument fails to give meaning to the plain language of the regulation. See *Central Kansas Medical Center v. Hatesohl*, 308 Kan. 992, 1002, 425 P.3d 1253 (2018) (In deciphering the meaning of a statute or regulation, we first look to the plain language of the provision and the ordinary meaning of that language.).

34

Under its plain language, K.A.R. 92-12-4a(b)(5) recognizes two different regulatory presumptions: one for families and another for spouses. As to the family presumption, K.A.R. 92-12-4a(b)(5) provides "there shall be a presumption that the place where a person's family is domiciled is that person's domicile." As to the spousal presumption, K.A.R. 92-12-4a(b)(5) presumes "[t]he domicile of a person who is married shall be the same as the person's spouse."

The plain language of this regulation also contemplates *different* exceptions to each of these presumptions. As to the family presumption,

> "[w]hen a person has made a home at any place with the intention of remaining there indefinitely and the person neither lives at the home in which the person's *family* lives nor intends to do so, then that person shall be deemed to have established a domicile separate from that person's *family*." (Emphases added.) K.A.R. 92-12-4a(b)(5).

As to the spousal presumption, a person is presumed to have the same domicile as the person's spouse "*unless there is affirmative evidence to the contrary*, the husband and wife are legally separated, or the marriage has been dissolved." (Emphasis added.) K.A.R. 92-12-4a(b)(5).

Only the spousal presumption was in issue at trial. Thus, K.A.R. 92-12-4a(b)(5) offered Gene three possible avenues to overcome that presumption: prove that he and Rita were legally separated; prove that their marriage had been dissolved; or present "affirmative evidence" contrary to the presumption that he shared Rita's Kansas domicile. Gene opted to present "affirmative evidence" contrary to the presumption. And the district court found this evidence overcame the spousal presumption by "clear and convincing proof."

35

KDOR does not challenge any of the factual findings supporting the district court's conclusion that Gene presented "affirmative evidence" contrary to the spousal presumption. See *Locks v. Boeing Co.*, 19 Kan. App. 2d 17, 21, 864 P.2d 738 (1993) ("The question of whether the presumption was overcome by evidence then is a question of fact, and the standard of review for a question of fact is to determine whether the district court's judgment is supported by substantial evidence."). Instead, KDOR's argument functionally challenges the district court's legal conclusion that Gene can overcome the spousal presumption without showing he lived apart from Rita.

KDOR's argument incorrectly assumes that the exceptions to the *family* presumption also define and limit the permissible exceptions to the *spousal* presumption. In this regard, KDOR and the panel majority construe K.A.R. 92-12-4a(b)(5) to create a spousal presumption that can be overcome only by a showing that the taxpayer "neither lives at the home in which the person's family lives nor intends to do so." But the plain language of the regulation provides that the *spousal* presumption will not apply in the face of contrary evidence, where the husband and wife are legally separated, or where the marriage has been dissolved. KDOR's argument and the panel majority's conclusion ignore this plain language and render it mere surplusage, contrary to our traditional rules of statutory and regulatory construction. See *State v. Van Hoet*, 277 Kan. 815, 826-27, 89 P.3d 606 (2004) (courts should avoid interpreting a statute in a way that renders portions of it moot or mere surplusage). Thus, the district court's conclusion that Gene had overcome the spousal presumption is legally sound because the plain language of the regulation allows a person to overcome the spousal presumption by "affirmative evidence to the contrary."

For these reasons, we conclude that the district court did not improperly shift the burden of proof in its analysis of the spousal presumption. And any error in the district court's inconsistent findings about the proof of Rita's domicile was harmless given the

36

district court's separate finding that Gene's affirmative evidence overcame the spousal presumption "by clear and convincing proof." And this conclusion is legally sound because the plain language of the regulation permits Gene to overcome the spousal presumption through "affirmative evidence" contrary to the presumption.

4. *The District Court Did Not Shift the Burden of Proof by Purportedly Finding BOTA's Order to Be Automatically Invalid*

KDOR argued in its opening brief that the district court had found BOTA's order to be automatically invalid because it was a summary decision rather than a full opinion. According to KDOR, "[t]he district court's arbitrary exclusion of any possibility that BOTA's decision could be correct and [the district court's] overt bias, passion, and prejudice resulted in shifting the burden of proof to KDOR."

While the Court of Appeals did not address this argument, the Bicknells requested review of this issue. Because the parties preserved the issue for appeal, we exercise our discretionary authority to review this issue. See Supreme Court Rule 8.03(j)(5) (2022 Kan. S. Ct. R. at 60) ("If issues decided by the district court were presented to, but not decided by, the Court of Appeals and review of those issues was preserved, the Supreme Court may consider and decide the issues, remand the appeal to the Court of Appeals for decision of the issues, or dispose of the issues as it deems appropriate.").

The district court was critical of the summary decision. Under *Bicknell II*'s mandate, BOTA needed to "consider K.A.R. 92-12-4 and K.A.R. 92-12-4a along with controlling statutory law and caselaw in determining Gene's tax-residency status for the years 2005 and 2006." 2015 WL 5613069, at *10. And the summary decision made it harder for the district court to analyze BOTA's compliance with this mandate.

But nothing in the record suggests the district court found the order automatically invalid. Nor does the record suggest that BOTA's summary decision caused the district court to shift the burden of proof to KDOR. Instead, as we determined, the district court placed the burden on Gene to prove a change in domicile, and it held him to this burden throughout the proceedings. We conclude that the district court did not improperly shift the burden of proof, and thus reverse the panel majority's holding on this issue.

III. *Substantial Competent Evidence Supports the District Court's Ruling*

Next, KDOR argues that substantial competent evidence does not support the district court findings pertinent to its ruling that Gene was domiciled in Florida. Though the Court of Appeals majority did not reach this challenge, both parties preserved the issue for appeal and requested our review. We exercise our discretion to review the issue. See Supreme Court Rule 8.03(j)(5).

A. *Standard of Review and Relevant Law*

When a district court has made findings of fact and conclusions of law, an appellate court determines whether the factual findings are supported by substantial competent evidence and whether those findings adequately support the district court's conclusions of law. *Beech Aircraft Corp. v. Kansas Human Rights Comm'n*, 254 Kan. 270, 275, 864 P.2d 1148 (1993); *Phillips*, 4 Kan. App. 2d at 261.

"'Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion.' In determining whether substantial competent evidence supports the district court findings, appellate courts disregard any conflicting evidence or other inferences that might be drawn from the evidence. [Citations omitted.]" *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014).

"'In evaluating the evidence to support the district court's factual findings, an appellate court does not weigh conflicting evidence, evaluate witnesses' credibility, or redetermine questions of fact.'" *Board of Miami County Comm'rs v. Kanza Rail-Trails Conservancy, Inc.*, 292 Kan. 285, 325, 255 P.3d 1186 (2011).

We cannot determine whether the evidence is legal and relevant, rising to the level of substantial competent evidence, in a vacuum. To assess the relevance of the Bicknells' evidence, we must first identify the legal framework governing taxpayer domicile under Kansas law.

In Kansas, resident individuals must pay income tax as computed according to the tax schedule set forth in the Kansas Income Tax Act, K.S.A. 79-3201 et seq. See K.S.A. 79-32,110(a). A "resident individual" is statutorily defined as "a natural person who is domiciled in this state." K.S.A. 79-32,109(b). K.A.R. 92-12-4a explains how to determine whether a taxpayer is a resident individual under this statutory definition. K.A.R. 92-12-4a(a), (b). Under this regulation, "domicile" means "that place in which a person's habitation is fixed, without any present intention of removal, and to which, whenever absent, that person intends to return." K.A.R. 92-12-4a(b)(1). Until its repeal in 2006, K.A.R. 92-12-4 defined "domicile" as "that place where a person resides, where the person has an intention to remain, and to which the person intends to return following any absence." K.A.R. 92-12-4(a) (2006).

A person may have only one domicile at a time. K.A.R. 92-12-4a(b)(2). And "[o]nce shown to exist, a domicile shall be presumed to continue until the contrary is shown." K.A.R. 92-12-4a(b)(2); see *Arnette*, 162 Kan. 677, Syl. ¶ 2 ("The general rule is that when a residence, or domicile, is once shown to have been established it is presumed to continue until it is clearly shown to have been abandoned.").

Under K.A.R. 92-12-4a(b)(2)(A), a change in domicile requires both physical removal from the prior domicile and an intent to abandon the prior domicile. "The mere intention to acquire a new domicile, without the fact of physical removal, shall not change a person's domicile, and the fact of physical removal from a person's domicile, without the intention to remain absent, shall not change that person's domicile." K.A.R. 92-12-4a(b)(2)(A). "The absence of any intention to abandon an existing domicile shall be considered to be equivalent to the intention to retain the domicile." K.A.R. 92-12-4a(b)(2).

Likewise, under K.A.R. 92-12-4, a change of domicile required "intent to change, actual removal, and the acquisition of a new domicile. The domicile shall not be changed by removal for a definite period or for particular purposes nor by abandonment of the old domicile until the acquisition of a new one is effected." K.A.R. 92-12-4(b) (2006).

These regulatory requirements align with Kansas common law, which requires the concurrence of two factors to establish a change of domicile:  (1) physical presence in a location; and (2) an intent to remain in that location, either permanently or indefinitely. *Phillips*, 4 Kan. App. 2d at 260. In terms of intent, a person must prove both an intent to abandon the old domicile and an intent to adopt another domicile in the new location. *Irvin v. Irvin*, 182 Kan. 563, 566, 322 P.2d 794 (1958); *Phillips*, 4 Kan. App. 2d at 261. While physical presence and intent must coincide to establish a new domicile, "[i]t is not necessary . . . that the intent be conceived at the same time as the removal to the new locality." *Irvin*, 182 Kan. at 566.

Kansas common law requires more than just a desire to acquire a new domicile. Instead, a person must intend to make his or her home in the new locale. "'Were it otherwise, persons could choose to be domiciled in a state of low burdens and high benefits quite irrespective of where they actually happened to live.'" *Phillips*, 4 Kan. App.

40

2d at 262 (quoting Restatement [Second] of Conflict of Laws § 18 [1971]). For these reasons, "'[a] person's domicil of choice is in the state to which he is most closely related rather than in the state where he wishes to be domiciled.'" 4 Kan. App. 2d at 262 (quoting Restatement [Second] of Conflict of Laws § 18 [1971]).

Thus, courts commonly look beyond a person's declared intentions in determining whether that person has shown the requisite intent for a change of domicile:

"'Intent is not a matter of artifice. It does not rest with a man to determine the place of his domicil by expressing an intent which is contrary to the facts in an attempt to avoid the inevitable legal consequences of such facts. The acts of the person must correspond with the purpose to change his domicil.'" 4 Kan. App. 2d at 262 (quoting 25 Am. Jur. 2d Domicil § 24).

As for evidence relevant to domiciliary intent, "'almost anything that bears on a person's attitude of mind toward a place is admissible.'" 4 Kan. App. 2d at 264 (quoting Restatement [Second] of Conflict of Laws § 20 [1971]). A person's formal declarations of intent, such as wills or vehicle registrations, and informal declarations of intent, such as statements made in casual conversation, are thus both admissible. 4 Kan. App. 2d at 263 (citing Restatement [Second] of Conflict of Laws § 20 [1971]). That said, "'[a]ctions speak louder than words, and the courts rely most heavily upon them.'" 4 Kan. App. 2d at 263 (quoting Restatement [Second] of Conflict of Laws § 20 [1971]). "'[I]n [the] final analysis, the courts place primary emphasis upon a person's home life and upon what he does rather than on what he says.'" 4 Kan. App. 2d at 264 (quoting Restatement [Second] of Conflict of Laws § 20 [1971]).

K.A.R. 92-12-4a(b)(7) also enumerates several factors relevant to taxpayer domicile. These factors include, in relevant part:

41

"(A) The percentage of time that the person is physically present within the state of Kansas and the percentage of time that the person is physically present in each jurisdiction other than the state of Kansas;

"(B) the location of the person's domicile for prior years;

"(C) the location at which the person votes or is registered to vote, except that casting an illegal vote shall not establish a domicile for income tax purposes;

. . . .

"(E) the location of services performed by the person in the course of employment;

. . . .

"(G) the change in the person's living quarters;

"(H) the person's ownership of other real property;

"(I) the jurisdiction in which the person has been issued a valid driver's license;

"(J) the jurisdiction from which any motor vehicle registration was issued to the person and the actual physical location of the person's vehicle or vehicles;

. . . .

"(L) the filing by the person of a Kansas tax return, report, or application as a Kansas resident or a nonresident individual;

"(M) the fulfillment or failure to fulfill by the person of the tax obligations required of a Kansas resident;

42

"(N) the address where personal mail is received by that person and not subsequently forwarded;

. . . .

"(Q) the representations made to any insurance company concerning the person's residence and on which any insurance policies are issued;

"(R) the location where the person, the person's spouse, or the person's minor children regularly participate in sporting events, group activities, or public performances; and

"(S) any other fact relevant to the determination of that person's domicile." K.A.R. 92-12-4a(b)(7).

K.A.R. 92-12-4a contains a much more extensive list of factors relevant to determining domicile than K.A.R. 92-12-4, which stated only that "[a] voting residence shall constitute evidence of domicile. The state where an individual's driver's license is issued and the state where an individual's vehicle is registered shall also constitute evidence of domicile." K.A.R. 92-12-4(c) (2006). That said, while both regulations set forth individual factors that may be relevant to a taxpayer's domicile, "[t]he concept [of domicile] is not subject to a formula, but depends on the facts of each case." *Peck v. University Residence Committee of Kansas State Univ.*, 248 Kan. 450, 464, 807 P.2d 652 (1991).

B. *Substantial Competent Evidence Supports the District Court Findings, and These Findings Support Its Conclusion That Gene Was Domiciled in Florida in 2005 and 2006*

KDOR argues the district court's ruling that Gene was a Florida resident in 2005 and 2006 is not supported by substantial competent evidence. We address KDOR's

43

specific arguments in turn, starting with KDOR's challenges to specific findings the district court made on the substantive factors relevant to domicile and then proceeding to KDOR's more general challenge to the probative value of Gene's testimony.

In her dissenting opinion, Chief Judge Arnold-Burger thoroughly recounted the trial evidence. *Bicknell III*, 59 Kan. App. 2d at 551-63 (Arnold-Burger, C.J., concurring in part and dissenting in part). We find it unnecessary to repeat that recitation here. Instead, we discuss the evidence most pertinent to our analysis in the next sections.

1. *K.A.R. 92-12-4a(b)(7)(A): Physical Presence in Kansas and Other Jurisdictions*

K.A.R. 92-12-4a(b)(7)(A) permits the district court to consider "[t]he percentage of time that the person is physically present within the state of Kansas and the percentage of time that the person is physically present in each jurisdiction other than the state of Kansas," in determining taxpayer domicile.

The parties offered conflicting evidence on this factor. The nonresident questionnaire sent to Gene as part of KDOR's desk review asked Gene to "list the days or part days that you were physically present in Kansas and the days that you were in your state of domicile" in 2004, 2005, and 2006. The written response stated:

|      | Kansas    | Domicile (Florida) |
|------|-----------|--------------------|
| 2004 | 111 days  | 111 days           |
| 2005 | 113 days  | 117 days           |
| 2006 | 111 days  | 134 days           |

The response also stated that the number of days Gene was in each state was determined using credit card charges, flight records, long distance records, and personal accounts.

44

Gene testified he did not participate in compiling the information used to determine how many days he spent in Kansas, Missouri, and Florida in 2005 and 2006. Instead, Jenika Cook, a senior wealth advisor at Mariner, led a group of employees who completed the nonresident questionnaire on Gene's behalf. Jenika testified that she and other employees created a calendar of Gene's location based on the information they had in their possession. When the questionnaire was completed, Jenika sent it to Gene's long-time assistant, Karen Badart, to get Gene's signature. Witnesses later testified that Gene did not personally review or sign the completed questionnaire. Instead, Gene told Badart to "handle it." Whenever Gene told Badart to "handle it," it meant that Badart could sign Gene's name. Badart signed Gene's name on the questionnaire and returned it to Jenika.

Despite his questionnaire responses, Gene testified at trial that he "probably didn't average 30 days a year" in Kansas in 2005 and 2006, and that he normally stayed in Florida between Branson show seasons. Gene did not deny that he spent time in Pittsburg during the assessment period, but he said that he only returned to Pittsburg to attend business meetings, family functions, or church events. Because he was often in Branson during the nine-month show season, Gene said he could make day trips to Pittsburg to attend these events.

Gene's friends, family, and colleagues generally corroborated Gene's testimony about where he spent his time during the assessment period. For example, Rita confirmed that Gene began living in Florida in January 2003 and would return to Florida between show seasons while working on Celebrate America in 2004, 2005, and 2006. Badart testified that starting in the early 2000s, Gene started spending more time in Florida than he did in Kansas, and he spent most of 2003 in Florida with Rita and was rarely in Pittsburg. Gene's son, Marty, testified that his father had used his Pittsburg home "very infrequently" since 2002, and Gene was not in Kansas very often in 2005 and 2006.

45

Several friends of the Bicknells testified that Gene began spending less time in Pittsburg or began living in Florida in the early to mid-2000s.

KDOR presented Gene's 2006 W-2 from NPC Management, which listed his Pittsburg home address. But Troy Cook, a friend of Gene's who was also employed as CFO of NPC, suggested Gene's W-2 was incorrect and had not been changed when Gene became a Florida resident.

KDOR introduced documentation showing that Gene had retained his membership with a Pittsburg country club through 2005 and 2006 and multiple charges were made on his account during this time. Gene testified that he maintained the membership because it was not very expensive, and the club had a beautiful golf course. He also said that he allows other people to charge to his account.

KDOR also introduced the Bicknells' membership records from the Mission Valley Country Club in Florida. In an application completed in 1999, Gene listed his Pittsburg home address as the primary residence and his Florida home address as his secondary residence. The club membership roster for the years 2003 to 2011 also listed both the Bicknells' Florida home address and their Pittsburg home address. Billing records showed fewer charges were made on the account in the summer and fall months.

KDOR presented testimony from Helen Kelly, who wrote articles for the Mission Valley Country Club newsletter. Kelly testified she interviewed Gene for the newsletter in February 2006. In the article, she wrote: "'Gene and Rita, who has a law degree from Washburn University, have been members of Mission Valley for over two years residing in the winter on Manasota Key, Englewood.'" She recalled that Gene specifically said he and Rita resided on Manasota Key in the winters, and she did not simply choose that phrasing.

46

In analyzing the competing evidence offered under this factor (the taxpayer's physical presence in Kansas and other jurisdictions), the district court found:

> "The only reliable evidence regarding the amount of time Gene spent in any particular state comes from the recollections of those people directly involved in knowledge of Gene's whereabouts. This is limited to Gene's personal assistant, his wife, and to a lesser extent a second tier of people like his son, Cindy Morris, etc. KDOR has no evidence. . . .
>
> "Taking the evidence as a whole and considering all of those witnesses that the court found believable and credible a significant conclusion is clearly established without the necessity of any specific percentages assigned. During the subject time[] frame[,] Gene spent most of his time in one of three states[:] Florida, Missouri or Kansas. Of those three it is the court's conclusion from the contradictory and contested evidence that Kansas was by far and away the state with the least physical presence."

The findings on Gene's physical presence in Kansas, Missouri, and Florida are supported by substantial competent evidence. Multiple witnesses testified that Gene spent little time in Pittsburg during 2005 and 2006 and typically returned only for family functions or business meetings. Otherwise, Gene was in Missouri or Florida.

Even so, KDOR challenges the district court's statement that the agency offered "no evidence" about Gene's physical presence in Kansas, Florida, and Missouri during the assessment period. To the contrary, KDOR argues it presented "abundant evidence," including country club records, Gene's W-2 from NPC Management, testimony that Gene did not retire, and Gene's testimony confirming his attendance at church and business meetings in Pittsburg. KDOR adds that Gene's answer to the nonresident questionnaire shows he was not spending more time in Florida than he was in Kansas. Based on this

47

evidence, KDOR argues the district court finding that "Kansas was by far and away the state with the least physical presence" was "arbitrary and capricious and disregards basic, underlying facts."

To begin with, viewing the "no evidence" remark in context, the district court meant that KDOR had presented no *reliable or persuasive* evidence of Gene's location during the assessment period—not that the agency presented no evidence. And the district court's determination that KDOR's evidence was not as reliable or persuasive as Gene's falls exclusively in the district court's purview. See *Board of Miami County Comm'rs*, 292 Kan. at 325.

The Order also expressly addressed much of the evidence KDOR claims the district court overlooked. In the Order, the district court addressed evidence of Rita's domicile. It discussed the testimony of Gene's friends, family, and colleagues who lived in Kansas. It found the evidence of Gene's country club memberships were "not particularly probative in this matter." The court considered the Bicknells' church membership, finding they did not formally join a Florida church until 2012, but concluding this did not suggest the Bicknells were not Florida residents before that time. Finally, in considering K.A.R. 92-12-4a(b)(7)(E)—location of services performed by the person in the course of employment—the court found "[t]here was testimony establishing that Gene would provide the services by teleconference from Florida, but the issue is not the location of the person but the services. This factor can be seen as weighing in favor of Kansas domicile."

Granted, the district court did not directly address Gene's responses to KDOR's nonresident questionnaire, which showed that Gene spent an almost equal number of days in Kansas, Florida, and Missouri from 2004 to 2006. Even so, it is apparent the district court considered and weighed this and similar evidence. Witnesses testified that

48

Jenika had only been working with the Bicknells for about a year when she helped complete the nonresident questionnaire. The district court also acknowledged that some of Gene's evidence of his whereabouts during the assessment period was inconsistent. But it found this was "more of a function of not tracking the information at the time than . . . any malicious or malevolent purpose." In the end, the district court was "not satisfied that any estimates by anyone other than those who would have been contemporaneously familiar with Gene's whereabouts on a day-to-day basis are accurate or worthy of serious weight or consideration." Quite simply, the district court placed more weight on the testimony of those closest to Gene. We will not disturb that finding by reweighing the evidence on appeal. 292 Kan. at 325.

KDOR also objects to the district court's reliance on witness testimony about Gene's diminished presence in Kansas during the assessment period. KDOR claims none of the witnesses were living in Florida or keeping a calendar with Gene's whereabouts, and they lacked first-hand knowledge of whether Gene was living in Florida or how much time he was spending there. KDOR argues this testimony cannot constitute substantial competent evidence because it was not based on personal knowledge.

KDOR's argument is not supported by the record. A proponent of any evidence, including witness testimony, must lay a foundation for its admission into evidence. *Wiles v. American Family Life Assurance Co.*, 302 Kan. 66, 74, 350 P.3d 1071 (2015). But Gene's witnesses testified to the basis of their personal knowledge of Gene's physical location during 2005 and 2006. See K.S.A. 60-419 (testimony of a witness' perception admissible if the judge finds any trier of fact could reasonably believe that the witness did perceive the matter). Some witnesses confirmed that Gene told them he was living in Florida throughout the assessment period. Others said when they needed to talk to Gene, they would call him in Florida. And witnesses who lived in Pittsburg said they saw Gene infrequently during the assessment period.

Though a witness' testimony must be based on personal knowledge, "'it "does not require that the witness' knowledge be positive or rise to the level of certainty."'" *United States v. Mixon*, 979 F. Supp. 1386, 1390 (D. Kan. 1997). Kansas law permits a witness to "testify as to what is more probable than not absent any showing of speculation." *Schlatter v. Ibarra*, 218 Kan. 67, 74, 542 P.2d 710 (1975).

KDOR's argument places the foundational bar for admitting witness testimony far beyond that set by the Legislature under K.S.A. 60-419. The testimony of these witnesses was properly admitted because they identified the basis of their knowledge of Gene's whereabouts (or his absence), and this basis was founded on the witnesses' personal knowledge, observations, interactions with Gene, and reasonable inferences from the same. See *State v. Craig*, 215 Kan. 381, 383, 524 P.2d 679 (1974) (witness testimony based on personal observation admissible). Given this foundational evidence, KDOR's challenge goes to the weight and credibility of the witnesses' testimony, not its admissibility. And such issues fall within the exclusive purview of the trier of fact—here, the district court judge. See *Schlatter*, 218 Kan. at 74.

The district court found that those closest to Gene credibly testified to his general absence from Pittsburg in 2005 and 2006. The district court also found this evidence was entitled to the greatest weight absent formal, contemporaneous recordkeeping. We find no error in the admission of this testimony, which in turn, provides substantial competent evidence supporting the district court findings.

2. *K.A.R. 92-12-4a(b)(2), (b)(7)(B): Location of the Person's Prior Domicile and Presumption of Continued Domicile*

K.A.R. 92-12-4a(b)(7)(B) permits the district court to consider "the location of the person's domicile for prior years" in determining taxpayer domicile. And K.A.R. 92-12-

50

4a(b)(2) provides that "[o]nce shown to exist, a domicile shall be presumed to continue until the contrary is shown."

In analyzing K.A.R. 92-12-4a(b)(2) and (b)(7)(B), the district court made several findings. It found Gene had likely established residency in Florida in 1999. Then, he changed his domicile back to Kansas at the end of 2000 so he could address ongoing business issues there. Gene then decided to become a Florida resident again in 2003, roughly two years before Merrill Lynch made its offer to buy NPC International. Thus, the district court found "[t]he year 2003 is the bright line demarcation where Florida once again became the chosen domicile" for Gene. "Kansas had been the previous domicile for only a short period." As noted, the district court also found that multiple witnesses credibly testified that Gene spent little time in Pittsburg during the assessment period.

Based on these findings, the district court determined that Gene had overcome the presumption that his Kansas domicile continued after 2003:

> "As to the very generic concept it is true that Gene had a prior domicile, that being Kansas. It is then incumbent upon Gene to demonstrate that he had met the necessary criteria as established by his actions and statements to establish a domicile of his choosing. As stated above, the court is convinced by clear evidence that those criteria have been met thus this factor weighs heavily in Gene's favor once all the evidence is considered."

On review, KDOR contends the district court finding that "Kansas had been the previous domicile for only a short period" is not supported by substantial competent evidence. Instead, KDOR argues the evidence establishes that Gene had been domiciled in Kansas long before 2003, and Gene stipulated to this fact.

51

KDOR's argument overlooks the nuances of the district court findings. The district court found Gene likely changed his domicile from Kansas to Florida in 1999, and then changed his domicile back to Kansas in 2000. Then Gene reestablished his Florida domicile in 2003. The district court's statement that Gene had been domiciled in Kansas "for only a short period" referred to the period between 2000 and 2003, before Gene reestablished his Florida domicile. This finding is not inconsistent with other evidence that showed Gene had been a Kansas resident for many years before 1999. For the same reason, this finding is not inconsistent with the parties' stipulation that Gene "was a Kansas resident prior to 2003."

Moreover, the statement that Gene had been domiciled in Kansas "for only a short period" was immaterial to the district court ruling. The import of Gene's stipulation is that Kansas was his prior domicile. Thus he needed to overcome the presumption that his Kansas domicile continued after 2003. See K.A.R. 92-12-4a(b)(2) ("Once shown to exist, a domicile shall be presumed to continue until the contrary is shown."). But the district court *did* find that Gene's prior domicile was Kansas, and it recognized that Gene had to overcome the presumption that his Kansas domicile continued after 2003.

After weighing the competing evidence, the district court determined that Gene had met his burden to show a change of domicile in 2003. Whether or not Gene had changed his domicile to Florida in 1999 before changing it back to Kansas in 2000 ultimately had no impact on the ruling. As the district court explained:

> "[T]he evidence establishes that Gene had resided in Pittsburg, Kansas, for many years. He then decided to take up residency in Florida [in 1999]. It is with great relief the court look[s] upon this earlier situation as one that does not have to be answered. It appears he may have accomplished that. In any event, Gene, in 2000, makes Kansas his domicile of choice and effectively transfers his residency back to his original state. The court is convinced by clear evidence that Gene reversed that course in 2003."

52

KDOR fails to establish error on this point.

### 3. *K.A.R. 92-12-4a(b)(7)(C): Location of Voting; K.A.R. 92-12-4a(b)(7)(I): Issuance of Driver's License*

K.A.R. 92-12-4a(b)(7)(C) permits the district court to consider "the location at which the person votes or is registered to vote" in determining taxpayer domicile. K.A.R. 92-12-4a(b)(7)(I) also permits the district court to consider "the jurisdiction in which the person has been issued a valid driver's license."

In analyzing these two factors, the district court recounted Gene's voter registration and driver's license history. It found that Gene consistently registered to vote and obtained a driver's license in the jurisdiction in which he wished to be domiciled. The district court also found Gene had carried his Florida driver's license and considered it his primary license since January 2003, and he registered to vote in Florida in 2004.

The district court also addressed KDOR's evidence that Gene renewed his Kansas driver's license in August 2004. At trial, Gene testified that he renewed his license because he received a renewal notice in the mail and "assumed that Kansas knew what they were doing." Gene testified that he did not know he had to be a Kansas resident to renew the license. Nor did he remember making any statement affirming Kansas residency during the renewal process. To counter Gene's version of events, KDOR presented testimony from Laura Krom, a driver's license specialist who worked at the Department of Motor Vehicles' office in Pittsburg. She said Gene affirmed that he was a Kansas resident and lived at his Pittsburg address as part of the renewal process. She remembered helping Gene because he was a local celebrity.

53

In weighing the competing evidence, the district court found that Gene had failed to provide a satisfactory reason why he renewed his Kansas license in 2004. But it also found Krom's testimony was "suspicious at best." The district court determined that the renewal had "little credit and weight on Gene's intent to make Florida [his] legal domicile."

KDOR contends the district court erred by relying, in part, on Gene's Florida driver's license and Florida voting history to conclude Gene was a Florida resident. KDOR argues that registering to vote in a state does not make one a resident of that state. Instead, being a resident allows one to vote. KDOR asserts the same is true for obtaining driver's licenses. According to KDOR, the district court's ruling is erroneous because it relies on evidence supporting factors that have no probative value.

But Kansas law undermines KDOR's argument. KDOR's own regulations expressly provide that the location of a person's voter registration and driver's license are relevant factors in determining taxpayer domicile. K.A.R. 92-12-4a(b)(7)(C), (b)(7)(I). And the prior version of that regulation, K.A.R. 92-12-4, likewise provided: "A voting residence shall constitute evidence of domicile. The state where an individual's driver's license is issued and the state where an individual's vehicle is registered shall also constitute evidence of domicile." K.A.R. 92-12-4(c) (2006). Kansas appellate courts have also recognized the probative value of these factors. See *In re Marriage of Anderson*, 25 Kan. App. 2d 754, 757, 969 P.2d 913 (1998) (finding that party's driver's license and voter registration were evidence of party's Arizona residency); *Phillips*, 4 Kan. App. 2d at 265 (finding that decedent's voting history and driver's license were evidence that he died a Missouri resident).

To bolster its argument, KDOR cites *Peck*, which held that

54

"[t]o permit a student to announce the intention of becoming a permanent resident of the state on the day of the student's arrival, to accept a biased and self-serving statement as the truth, and to permit the student to reinforce the statement by registering a car and securing a driver's license in this state would simply place a premium on deception." *Peck*, 248 Kan. at 464-65.

But *Peck* analyzed whether a student attending a Kansas educational institution was a Kansas resident for tuition purposes. That determination is governed by a separate regulatory scheme, which explicitly provides that registering to vote in Kansas or obtaining a Kansas driver's license, standing alone, is not ordinarily sufficient to establish Kansas residency. See K.A.R. 88-3-2(c)(1), (c)(7). In contrast, K.A.R. 92-12-4a contains no similar constraints.

Evidence of a person's voter registration and driver's license can be probative of taxpayer domicile. Thus the testimony and records supporting the district court findings on these two factors is properly characterized as substantial competent evidence.

### 4. *K.A.R. 92-12-4a(b)(7)(H): Real Property Ownership*

K.A.R. 92-12-4a(b)(7)(H) permits the district court to consider a person's ownership of other real property in determining the residency of a taxpayer. In considering this factor, the district court made several findings.

While there was no specific evidence about the value of the Bicknells' Pittsburg house, the district court found their Florida house was larger and likely much more valuable. It also acknowledged that the Bicknells owned more land and a cattle operation in Kansas but found that "in considering all the evidence it appears this is an enterprise in which Gene is, at most, nominally involved and absentee farm and ranch ownership is too

55

commonplace for the mere ownership to be particularly significant." The district court ultimately concluded that "[t]his factor weighs slightly in favor of Florida domicile."

In challenging the district court findings, KDOR argues the value of the Bicknells' Florida house was mostly attributable to the land and not the house itself. KDOR adds that, unlike Kansas, Gene did not own any land in Florida which he had to "tend, run cattle on, or find tenants for." Finally, it notes that the district court skirted "Gene's ownership of enormously valuable business and industrial property through corporations or limited liability companies in Kansas."

As to the relative value of the residential properties, KDOR's argument invites us to second-guess the district court's weighing of the competing evidence. As previously noted, our standard of review precludes us from accepting this invitation. As for Gene's cattle operation, Bicknell Farms' manager testified that he oversaw the operation with little input from Gene. Thus, the district court finding that Gene had minimal involvement in the management of Bicknell Farms is supported by substantial competent evidence.

Even if the district court did not make specific findings about Gene's business and industrial property, KDOR cites no evidence in the record establishing the value of these properties. Nor did KDOR object to the adequacy of the findings. Thus, we presume the district court made the findings necessary to support its judgment—that is, that the court found the value of these properties did not alter its conclusion that this factor weighed "slightly in favor of Florida domicile." See *Dragon v. Vanguard Industries*, 282 Kan. 349, 356, 144 P.3d 1279 (2006) ("Where no objection [to inadequate fact-findings] is made, this court will presume the trial court found all facts necessary to support its judgment.").

56

The district court findings addressing real property ownership are supported by substantial competent evidence, and KDOR has failed to establish error.

### 5.   *K.A.R. 92-12-4a(b)(7)(E):  Employment Services*

K.A.R. 92-12-4a(b)(7)(E) provides that "the location of services performed by the person in the course of employment" may be considered in determining a taxpayer's domicile. In considering this factor, the district court found that Gene was CEO of NPC International until December 2004 and remained chair of its board until he sold the company in 2006. The district court also found that Gene relinquished his management responsibilities for Pitt Plastics in 2002. Finally, the court found that Gene worked as an advisor for Mariner Management in Overland Park during at least part of the assessment period. Gene's evidence suggested that he performed these services by phone while residing in Florida. But the district court found the location of the services, not the person, to be controlling. Thus, it concluded that this factor favored Kansas domicile.

Though the district court determined that this factor favored Kansas domicile, KDOR claims the court overlooked the significance of this evidence. According to KDOR, Gene's continued work or affiliation with these entities proves that he had not retired at all, let alone retired to Florida. To bolster this point, KDOR highlights Gene's testimony that he did not announce his retirement or have a retirement party and testimony from several witnesses that Gene did not retire or slow down. For instance, Troy testified that he never heard Gene express the desire to slow down. Troy did not believe Gene had retired or even had it in him to retire. One of Gene's other friends described Gene as a "workaholic" and a hard man to slow down. And yet another friend and business partner testified that "even though [Gene] might have been thinking he was going to slow down, I never saw him slow down very much."

But this evidence was controverted. Gene testified that he had retired in 2003 according to his definition of retirement—that is, "doing the things [he] want[s] to do and not what [he] ha[s] to do." He testified that he cut back on his business interests throughout 2003. And by the end of 2004, he had relinquished his primary management responsibilities for the two companies that had taken up most of his time—NPC International and Pitt Plastics. Marty corroborated this testimony. Likewise, Cindy Morris, a bookkeeper for Gene from 1991 to 2010, testified that Gene started to slow down for him around 2003 or 2004. While Gene did not announce his retirement, he testified that he did not feel it was necessary because he thought everyone knew. And while Troy testified that Gene had not retired, he also testified that Gene's involvement in NPC International had decreased over time and that Gene had spent most of his time working on his theatrical production in Branson, Missouri.

Whether Gene retired or continued to provide services to businesses in Kansas does not resolve the domicile question. While KDOR quibbles with Gene's definition of "retirement," Gene did not have to retire (under any definition of that term) to establish Florida residency. KDOR's argument (and the evidence it highlights) simply seeks to impeach Gene's testimony, which suggested his retirement was a motivating factor for changing his domicile to Florida. But the district court generally found Gene's testimony about motive to be sincere and credible, and it resolved the conflicting evidence in Gene's favor. Appellate courts do not reassess witness credibility determinations on appeal. KDOR's argument fails to establish error.

### 6. *K.A.R. 92-12-4a(b)(7)(L): Tax Records*

K.A.R. 92-12-4a(b)(7)(L) provides that "the filing by the person of a Kansas tax return, report, or application as a Kansas resident or a nonresident individual" may be considered in determining a taxpayer's domicile. In considering this factor, the district

58

court found that Gene filed his 2000 and 2001 Kansas income tax returns as a resident. But since 2003, Gene has represented to "all taxing authorities, including the [S]tate of Kansas, that he was a resident of Florida." The district court did not make any finding specific to Gene's 2002 tax returns. The district court also found that Gene had listed his Florida home address on his federal income tax returns in 2004, 2005, and 2006. Gene listed the same address on state income tax returns filed in more than 11 states.

On top of these income tax filings, the district court found that Gene paid the Florida intangible property tax (assessed only on Florida residents) in 2004, 2005, and 2006. And he applied for the Florida homestead exemption in 2006. To qualify for that exemption, an applicant must show that they own real property in Florida and maintain a permanent residence on the property. To satisfy these eligibility requirements, Gene had to produce a valid Florida driver's license, a valid Florida voter registration card, and proof that he had registered vehicles in Florida. Based on these findings, the district court found that "[t]his factor heavily weighs in favor of determining Florida as Gene's domicile."

Like its arguments about Gene's voter registration and driver's license, KDOR claims that Gene's tax filings reflected only where Gene wished to claim residency and thus had no probative value. But again, K.A.R. 92-12-4a(b)(7)(L) makes clear that a court may consider whether a person filed Kansas tax returns as a resident or nonresident in determining that person's domicile. And the probative value of Gene's tax payments in general is supported by Kansas common law. *Anderson*, 25 Kan. App. 2d at 757 (finding that payment of Arizona income taxes supported finding of Arizona residency); *Phillips*, 4 Kan. App. 2d at 265 (finding that payment of Missouri taxes was evidence of Missouri residency).

59

KDOR also points to evidence that Gene paid a late penalty for both his 2004 and 2005 Florida intangible tax returns and that these late filings were due on September 30, 2005. KDOR infers from this evidence that "Gene was scrambling to bolster his Florida tax preference" in the fall of 2005 before the sale of NPC International in May 2006. KDOR argues that Gene's belated payment of these Florida taxes was a "low-cost trade-off" to avoid paying Kansas income tax on the proceeds from the sale of NPC International.

While a finder of fact might have been free to draw similar inferences from this evidence, the district court did not. Instead, it found "Gene's motives regarding domicile were sincere," and he was not motivated by Kansas income tax avoidance. "In determining whether there is substantial competent evidence to support the district court's findings, this court will look only to the evidence in the light most favorable to the prevailing party below," i.e., Gene. *Carr v. Unit No. 8169*, 237 Kan. 660, 664, 703 P.2d 751 (1985). In doing so, we must disregard KDOR's suggested inference from this evidence. See *Gannon*, 298 Kan. at 1175-76.

KDOR also claims the Florida homestead tax exemption is of no probative value because the approval process is not very rigorous. At trial, an employee of the Sarasota County Property Appraiser testified that the office would have verified Gene's ownership of the property, his Florida driver's license, and his registration to vote in Florida, but would not have verified any other information on the application. But whatever KDOR thinks of the approval process for Florida homestead exemptions, its argument goes to the weight of that evidence. Once again, under our standard of review, we do not reweigh the evidence presented at trial. For these reasons, we find no deficiency in the evidence supporting the district court findings under this factor. And these findings lend adequate support to the district court's conclusion that this factor favored Florida domicile.

60

### 7. *K.A.R. 92-12-4a(b)(7)(S): Other Relevant Facts*

K.A.R. 92-12-4a(b)(7)(S) provides that a court may consider "any other fact relevant to the determination of that person's domicile." In considering this catch-all provision, the district court addressed the choice of law provisions in Gene's estate planning documents, Gene's various business filings, the location in which the Bicknells celebrated major holidays, and their church attendance.

As to the Bicknells' church attendance, the evidence established that Gene and Rita were long-time members of the First Baptist Church in Pittsburg. They were both on the board of trustees for the church in 2005 and 2006. Gene testified that he and Rita would make day trips from Branson to attend trustee meetings in Pittsburg during that time. Their contributions accounted for more than half of the church's budget. So when they moved to Florida, they did not immediately cut off their financial support. Despite their continued membership at First Baptist in Pittsburg, the Bicknells testified they had been actively looking for a church in Florida in 2005 and 2006. Still, they did not join a Florida church until 2012. Gene explained he and Rita struggled to find a Florida church they "were really comfortable in."

Based on this evidence, the district court found:

"Gene and Rita are practicing Christians who regularly attend church. . . . For many years Gene and Rita belonged to the First Baptist Church in Pittsburg, Kansas. Gene and Rita were not members of a Florida church during 2003 to 2006 and did not formally join a Florida church until 2012.

"Although the evidence does suggest that Gene and Rita attended meetings and services, one would presume they were instrumental in this church's finances, therefore, such attendance, even for a Florida resident, would not be surprising. It is within the common knowledge and understanding of a Christian that a home church is a personal

61

and intimate decision and the fact [that the Bicknells] were unable to locate a suitable substitute home church until 2012 certainly does not indicate they were not residents of Florida prior to 2012."

KDOR argues the district court findings on this issue are not supported by substantial competent evidence. It notes that "Gene's faith and [its] importance in his life are unquestioned," thus it logically follows that the location of Gene's church would be the same location where he intended to make his permanent home. Because Gene did not join a Florida church until 2012, KDOR contends this evidence establishes that Gene was not a Florida resident in 2005 and 2006.

We disagree. Church membership can be probative of domicile. See *Phillips*, 4 Kan. App. 2d at 263-64. And a trier of fact could have found the disputed evidence supported an inference that Gene was domiciled in Kansas. But the district court did not embrace such an inference from the evidence. And its finding to the contrary is supported by substantial competent evidence. Gene testified that he and Rita were actively looking for a Florida church during the assessment period. And Gene was reluctant to immediately sever his relationship with the Pittsburg church because it depended on his significant financial support.

KDOR would have drawn a different inference from the evidence. But on disputed issues of fact like these, we view the evidence in a light most favorable to the Bicknells. See *Elder v. Arma Mobile Transit Co.*, 253 Kan. 824, 827, 861 P.2d 822 (1993). Construing the evidence in this light, KDOR fails to establish error.

8.  *The District Court Properly Considered Gene's Testimony in Determining His Domicile*

Finally, KDOR argues Gene's testimony does not provide substantial competent evidence in support of the district court findings for many reasons. First, KDOR claims Gene's testimony that he retired and became a Florida resident in 2003 "was meaningless and without probative value" because it depended solely on Gene's subjective understanding of what it means to retire or how one accomplishes a change in domicile. But Gene's testimony established his good-faith motive for changing residency, outlined the steps he took to accomplish the change in domicile, and placed those acts into a relevant timeline of events. This testimony was probative of and material to the question of domicile. Even if Gene's testimony was founded on his own personal understanding of residency requirements or his definition of retirement, this goes to the credibility and weight of Gene's testimony only. And it is apparent the district court relied on established Kansas law, not Gene's understanding of residency requirements or his definition of retirement, when weighing the competing evidence. KDOR's argument again invites us to reweigh the lawfully admitted evidence, contrary to the controlling standard of review.

Second, KDOR asserts that Gene's testimony focused on "citing and authenticating" his formal declarations of intent related to his Florida residency, and these self-serving declarations are not substantial evidence of domiciliary intent. But this characterization of Gene's testimony is simply not accurate. Gene provided extensive testimony on various topics such as his business involvement; his relationship with Rita; his activities and hobbies; and the time he spent and the actions he took in various locales. While declarations of intent "'may be suspect because of their self-serving nature'" they are still "'generally admissible as evidence of [one's] attitude of mind.'" *Phillips*, 4 Kan. App. 2d at 263; *Landiak v. Richmond*, 899 So. 2d 535, 543 (La. 2005) ("party's uncontroverted testimony regarding his intent may be sufficient to establish domicile, in the absence of any documentary or other objective evidence to the

63

contrary"). Ultimately, the district court determines the weight and credibility of such declarations based on the time and circumstances in which they are made. See 25 Am. Jur. 2d Domicil § 60. Here, the district court did not rely on Gene's formal declarations of intent alone. It found Gene's testimony credible because Gene's contemporaneous actions and statements corroborated his declarations.

Third, KDOR argues "Gene cannot carry his burden of proof by disputing himself." KDOR again points out that Gene's testimony on the number of days he spent in Kansas contradicts the nonresident questionnaire, which bore Gene's signature under penalty of perjury and showed that he spent just over 100 days in both Kansas and Florida during 2005 and 2006. KDOR also relies on several business filings and legal documents from the assessment period listing Gene's Kansas address to highlight this conflicting evidence.

In support of this argument, KDOR cites authority holding that a party cannot create a genuine issue of material fact and overcome a motion for summary judgment by impeaching one's previous testimony. See, e.g., *Mays v. Ciba-Geigy Corp.*, 233 Kan. 38, Syl. ¶ 1, 661 P.2d 348 (1983). Of course, here the evidence was presented at a bench trial, and no summary judgment motion is at issue on appeal. Caselaw prohibiting the use of sham affidavits to create a genuine issue of material fact has little application beyond the summary judgment context.

In fact, Kansas courts have long recognized that contradictory or inconsistent statements of a party-witness are admissible for impeachment purposes at trial. See *Kelsey v. Layne*, 28 Kan. 218, 221 (1882). This rule has been codified by the Legislature. See K.S.A. 60-420. Parties may even impeach their own witnesses at trial through their prior inconsistent statements. K.S.A. 60-420. Thus, inconsistent statements of a witness may influence credibility determinations made by the trier of fact. But neither conflicting

64

testimony nor inconsistent statements render a witness' testimony unreliable as a matter of law. See *State v. Lopez*, 299 Kan. 324, 329, 323 P.3d 1260 (2014). "To the contrary, we trust [triers of fact] to resolve those credibility and [weighing] questions." 299 Kan. at 329-30.

The district court found the trial testimony and records related to Gene's physical presence in Florida more persuasive than the conflicting information in the nonresident questionnaire and business filings. And this finding is supported by substantial competent evidence. While Gene's testimony confirmed that he served as the resident agent for many companies, he did not learn what a resident agent was until trial. Gene's assistants, Badart and Morris, handled his business filings, and there is no evidence that Gene instructed them to use his Kansas address or declare Kansas residency in these documents. Witnesses also testified that Gene did not review or personally sign the nonresident questionnaire. While Gene perhaps should have been more attentive to these documents, Kansas law does not require the district court to disregard Gene's trial testimony that conflicted with prior representations made in his name.

But KDOR argues agency law compels this very conclusion. Agency refers to "'the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.'" *Golden Rule Ins. Co. v. Tomlinson*, 300 Kan. 944, 955, 335 P.3d 1178 (2014). When an agent acts with the principal's authorization, the agent's acts are generally imputed to the principal. 300 Kan. at 956.

KDOR argues that Gene's assistants were his agents and their representations that Gene was a Kansas resident are controlling. Thus, KDOR asserts the district court erred by finding "there is no legal or equitable reason these filings should be regarded as

anything other than what the evidence suggests that they are[—]the products of two non-law trained assistants trying to keep track of business filings. They are not evidence of an intended domicile in Kansas."

Relying on KDOR's agency theory, the district court could have imputed Badart's and Morris' declarations to Gene. But KDOR cites no authority suggesting that an agents' representations about a principal's residency are conclusive as to the question of domicile or otherwise trump other evidence to the contrary. An agent's declaration about the principal's residency may be treated the same as a principal's declaration about residency—that is, it can be relevant evidence of domicile. Thus, KDOR's reliance on agency theory shows, at best, an inconsistency between Gene's testimony and declarations found in some of his business filings. But, as previously noted, inconsistent statements do not render Gene's testimony unreliable as a matter of law. Instead, it is up to the trier of fact to resolve the disputed issue of fact by assessing the credibility of the witnesses and weighing the competing evidence. *Lopez*, 299 Kan. at 329-30. Here, the district court did just that and found the representations made by Gene's agents carried little weight in determining Gene's domiciliary intent because of the circumstances in which Gene's assistants made them. KDOR's argument fails to establish error.

C.  *Substantial Competent Evidence Conclusion*

KDOR raised several arguments challenging the substantial competent evidence supporting the district court findings. These arguments largely invite us to reweigh the evidence and reassess witness credibility. But this is the role of the district court, not the appellate courts.

66

When, as here, the parties each presented copious amounts of evidence and vigorously contested nearly every inference drawn from the evidence, the significance of the district court's credibility determinations cannot be overstated. As Judge Smith observed:

"This is a task nearly every trial assigns in some degree, but in the instant matter the volume of information offered combined with the oppositional interpretation subjected to nearly every shred of evidence made exceptional the normative requirement of careful and thorough evaluation of weight and credit of the evidence. No single factor was more decisive resolving conflicts in evidence than credibility.

"The pertinence of credibility required a constant awareness of apparent demeanor, body language, voice inflection, relation to other evidence as well as the evidence as a whole, potential bias, prejudice or favor, whether rational and/or logical, and simply whether it made common sense. If the evidence was then deemed to be sufficiently credible, the court was then required to recapitulate through an analysis in order to determine the weight to be ascribed."

Unlike the district court judge, we cannot assess each witness' "demeanor, body language, voice inflection," and other observations pertinent to a witness' credibility. For this very reason, the scope of our review is limited. We have long observed:

"Where findings of fact are attacked for insufficiency of evidence or as being contrary to the evidence, the supreme court's power begins and ends with the determination whether there is any competent substantial evidence to support them, and where findings are so supported they are accepted as true and will not be disturbed on appeal, and in such a case it is of no consequence that there may have been much contradictory evidence adduced at the trial which, if believed by the trial court, would have compelled entirely different findings of fact and an entirely different judgment." *Fine v. Neale Construction Co.*, 186 Kan. 537, Syl. ¶ 1, 352 P.2d 404 (1960).

67

Over the course of the eight-day de novo trial, the parties presented a wide array of conflicting evidence on nearly every relevant issue of fact. Judge Smith continuously assessed the credibility of the testifying witnesses and weighed the competing evidence in arriving at his findings. It is not the proper function of this court to reassess witness credibility or reweigh the conflicting evidence. Instead, our court is charged with the duty to determine whether the district court findings are supported by "'such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion.'" *Geer v. Eby*, 309 Kan. 182, 190, 432 P.3d 1001 (2019). Based on our thorough review of the extensive evidentiary record, we hold that the district court findings are supported by substantial competent evidence, and we affirm the district court Order.

## IV. *KDOR's Remaining Claims Fail to Establish Error*

Finally, KDOR brings a series of challenges alleging the district court failed to properly apply Kansas law, flouted the mandate in *Bicknell II*, and failed to fulfill its duties under K.S.A. 2020 Supp. 60-252. As with the previous issue, both parties request our review even though the Court of Appeals majority did not reach KDOR's challenge. In the interests of judicial economy, we exercise our discretion to review these remaining issues. See Supreme Court Rule 8.03(j)(5).

### A. *Standard of Review*

KDOR's challenges present questions of law, all of which are subject to de novo review. See *Gannon v. State*, 303 Kan. 682, 702, 368 P.3d 1024 (2016) (determination of whether district court complied with appellate court mandate is question of law subject to de novo review); *Hays v. Ruther*, 298 Kan. 402, 404, 313 P.3d 782 (2013) ("The interpretation and application of statutes is a matter of law over which this court exercises unlimited review."); *Johnson v. Brooks Plumbing*, 281 Kan. 1212, Syl. ¶ 2, 135 P.3d

1203 (2006) ("Statutory interpretation, interpretation and application of court precedent, and constitutional due process questions raise issues of law subject to unlimited appellate review.").

B.  *The District Court Did Not Erroneously Apply "Gene's Law" in Determining the Domicile Issue*

KDOR argues the district court erroneously used Gene's personal legal test, which KDOR calls "Gene's law," to determine whether he was domiciled in Florida. "Gene's law" refers to Gene's testimony that his accountants told him he needed to do five things to become a Florida resident:  (1) have a residence; (2) register a vehicle; (3) obtain a driver's license; (4) open a bank account; and (5) register to vote.

In its decision, the district court noted that Gene had sought advice on how to accomplish a change of residency to Florida in 1999. But the district court made this observation in service of a broader point—that by seeking and heeding such advice, Gene had taken actions consistent with an intent to change his domicile to Florida. The district court did not determine that Gene was a Florida resident because he took those five steps outlined by his accountants. Rather, the district court reviewed applicable Kansas law— including K.A.R. 92-12-4a, the prior version of the regulation at K.A.R. 92-12-4, and controlling Kansas statutes and common law. And it made extensive factual findings consistent with this authority before concluding that Gene was domiciled in Florida in 2005 and 2006. Had the district court determined Gene's residency according to "Gene's law," this extensive analysis would have been superfluous. We hold the district court properly applied Kansas law, not "Gene's Law," to the factual findings.

C. *The District Court Ruling Did Not Erroneously Rely on Gene's Introspection Rather Than His Actions*

Next, KDOR contends the district court's ruling relied almost exclusively on Gene's testimony about his domiciliary intent, contrary to Kansas precedent. KDOR argues that Gene's actions do not corroborate his testimony about his intent to retire to Florida. Thus, KDOR believes the district court erroneously based its ruling solely on Gene's introspective thoughts.

Kansas appellate authority does suggest that a person's expressed intent alone cannot typically establish a change of domicile when other evidence suggests a contrary intent. See *Phillips*, 4 Kan. App. 2d at 264 (expressed intent, standing alone, is not necessarily sufficient to establish a change of domicile when other facts show a contrary intent). But the district court did not conclude that Gene was a Florida resident in 2005 and 2006 based solely on his declared motives and intent. In fact, the district court expressly acknowledged this Kansas appellate authority, explaining that "as important as sincere intent might be it alone is not enough" to establish a change of domicile. The district court also rejected "Gene's counsel's suggestion that if Gene's testimony is found to be honest, sincere and believable the court could rule in favor of his position on domicile based solely thereon." The district court also noted that this case was not "one of the unique cases where the evidence is equal allowing the person[']s stated desire to control. The overwhelming evidence is that Gene through his actions established Florida as his domicile well before the tax years in question."

For KDOR to prevail on this challenge, we must ignore all evidence corroborating Gene's testimony about his intent to change domicile, including: testimony from several witnesses that Gene was mostly absent from Pittsburg in 2005 and 2006 and that he returned to Florida between Branson show seasons; Gene's relinquishment of management responsibilities for his two largest companies; the Bicknells' decision to hire

70

a full-time housekeeper for their Pittsburg home; witness testimony that Gene had said in casual conversation that he lived in Florida; multiple testamentary documents stating Gene lived in Florida and that Florida law should apply to those documents; and other evidence establishing that Gene registered as a Florida voter and obtained a Florida driver's license before the assessment period. KDOR's argument would also require us to construe all reasonable inferences from this evidence in favor of the agency. But our standard of review requires just the opposite. *Carr*, 237 Kan. at 664. As we have reiterated throughout this opinion, the task of weighing the evidence and resolving evidentiary conflicts falls exclusively to the district court. Here, the district court competently performed this task.

D. *The District Court Did Not Refuse to Consider Objective Facts*

KDOR claims the district court "arbitrarily and capriciously disregarded" objective facts showing Gene was domiciled in Kansas during the assessment period. KDOR cites the following passage from the Order in support of its argument:

> "There are two exceptions where the evidence in context supports KDOR's position. They are (1) the incident at the Driver's License Bureau in Pittsburg and (2) a sentence in an interview for a retirement community newsletter. For reasons previously explained, they alone do not outweigh the other evidence. KDOR, undoubtedly will argue the court has ignored others. That is simply not the case. The other evidence, in context with the evidence as a whole, just does not have the probative value KDOR contends. The overwhelming credible evidence with probative value suggests that Gene was in fact a resident of Florida, not Kansas, in 2005 and 2006."

According to KDOR, this passage confirms that the district court considered only the testimony of two KDOR witnesses and ignored all other evidence it presented.

71

We reject KDOR's argument for at least two reasons. First, in this passage, the district court found KDOR's "other evidence . . . does not have the probative value KDOR contends." To reach this conclusion, the district court necessarily considered and weighed KDOR's other evidence. Second, as we determined, the Order addresses most of the evidence KDOR claims the district court ignored. What KDOR really disagrees with is the way the district court weighed KDOR's competing evidence and resolved the disputed issues of fact. But again, we do not reweigh the evidence on appeal. KDOR has failed to establish error on this basis.

E. *The District Court Did Not Improperly Use K.A.R. 92-12-4a(b)(7) as a Formula for Determining Gene's Domicile*

KDOR claims the district court improperly used K.A.R. 92-12-4a(b)(7) as a formula and ignored relevant statutes and caselaw, contrary to the *Bicknell II* mandate. See *Peck*, 248 Kan. at 464 (concept of domicile is not subject to a formula). But the district court did not use the list of factors in K.A.R. 92-12-4a(b)(7) as a formula. In fact, the district court explained that it used these regulatory factors to provide organizational structure to the Order and to show its compliance with *Bicknell II*'s mandate to consider K.A.R. 92-12-4 and K.A.R. 92-12-4a, along with pertinent statutory law and caselaw. The district court thoroughly analyzed Kansas statutory law, regulatory law, and common-law principles and applied it to the evidence.

Further, as previously noted, many factors outlined in K.A.R. 92-12-4a(b)(7) arise from or track our established common-law principles. KDOR identifies no specific legal factor, principal, or doctrine established under Kansas statute or common law that the district court overlooked in its Order. We conclude that the district court did not apply K.A.R. 92-12-4a in a formulistic manner to the exclusion of established Kansas statutes or common law.

72

F.  *KDOR Failed to Preserve its Challenge Under K.S.A. 2020 Supp. 60-252*

KDOR claims the Order violates K.S.A. 2020 Supp. 60-252(a)(1), which provides that "[i]n an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately." KDOR explains that the Order intermingles findings of fact with conclusions of law, contrary to the statutory directive. KDOR believes this error warrants a remand for a new trial.

While the district court has the initial duty to provide adequate findings and conclusions on the record, a party also "has the obligation to object to inadequate findings of fact and conclusions of law in order to preserve an issue for appeal because this gives the trial court an opportunity to correct any findings or conclusions that are argued to be inadequate." *Fischer v. State*, 296 Kan. 808, 825, 295 P.3d 560 (2013). "In the absence of an objection, omissions in findings will not be considered on appeal. Where there has been no such objection, the trial court is presumed to have found all facts necessary to support the judgment." *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, 378, 855 P.2d 929 (1993). "'However, this court may still consider a remand if the lack of specific findings precludes meaningful review.'" *Phillips v. State*, 282 Kan. 154, 179, 144 P.3d 48 (2006).

KDOR did not object to the district court findings and conclusions below. And the district court made sufficient factual findings throughout its 53-page Order to enable meaningful review, disposing of any need for remand. KDOR failed to adequately preserve this issue for appellate review.

73

V. *We Decline to Reach the Bicknells' Constitutional Challenge*

Finally, the Bicknells claim KDOR's application of K.A.R. 92-12-4a to this case rendered the regulation unconstitutionally vague. According to the Bicknells, this constitutional challenge provides an alternate basis for affirming the district court's reversal of BOTA's order.

But "[a]ppellate courts generally avoid making unnecessary constitutional decisions. Thus, where there is a valid alternative ground for relief, an appellate court need not reach constitutional challenges." *Wilson v. Sebelius*, 276 Kan. 87, 91, 72 P.3d 553 (2003). Because we reverse the panel majority decision and affirm the district court's judgment on other nonconstitutional grounds, we decline to review the Bicknells' constitutional challenge.

CONCLUSION

In sum, we hold that venue for these proceedings was proper in Crawford County under K.S.A. 77-609(b) because BOTA's order found Gene to be a Kansas resident based on his contacts with Crawford County, thus rendering the order "effective" there under the statute. Thus, the district court did not err in denying KDOR's motion to dismiss the Bicknells' petition for improper venue under K.S.A. 2020 Supp. 60-212(b)(3). KDOR also failed to show that the district court abused its discretion in denying KDOR's request to transfer venue to Shawnee County under K.S.A. 60-609(a). Thus, we reverse the Court of Appeals' holding on the venue issue.

We also hold that the district court recognized and held Gene to his burden to prove he was a Florida resident during the assessment period. The majority of the Court of Appeals panel relied on excerpts from the Order to reach the contrary conclusion. But

74

when viewed in context, these excerpts merely acknowledged that KDOR failed to persuasively rebut Gene's "clear evidence" that he was domiciled in Florida during the assessment period. The district court's analysis is not properly characterized as burden shifting. Instead, our detailed review of the Order confirms that Judge Smith fulfilled his duty to weigh the evidence, assess witness credibility, and resolve disputed issues of fact.

Finally, we reject KDOR's argument that the district court findings are not supported by substantial competent evidence and that the district court Order otherwise flouts Kansas law. Upon closer scrutiny, most of these arguments are thinly veiled invitations to reweigh the evidence, contrary to our controlling standard of review.

Judgment of the Court of Appeals reversing the judgment of the district court is reversed. Judgment of the district court is affirmed.

STEGALL, J., not participating.